**Jane DOE, Plaintiff,**

v.

**John ROE and Roe and Roe, Ltd., Defendants.**

**No. 90 C 5717.**

United States District Court, N.D. Illinois, E.D.

Jan. 7, 1991.

John S. Elson, Northwestern University Legal Clinic, Chicago, Ill., for plaintiff.

Edward J. Rolwes, Thomas P. McGarry, and Caroline A. Mondschean, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Presently pending is defendants' motion to dismiss the amended complaint. On such a motion, all the well-pleaded allegations of the complaint are assumed to be true and all reasonable inferences from the facts alleged are drawn in favor of plaintiff. *Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1039 (7th Cir. 1987). The motion will be granted only if defendant can demonstrate that the facts alleged cannot support a claim. *See id.* at 1039–40.

Plaintiff Jane Doe was a client of defendant John Roe, an attorney with and shareholder of defendant Roe and Roe, Ltd., a professional services corporation. Roe represented Doe in divorce proceedings she was involved in. The core of the complaint is that Roe misused his position as Doe's attorney to coerce and intimidate Doe into having sexual relations with him. There can be no doubt that the alleged actions are reprehensible. The question, though, is whether the alleged actions of Roe constitute a cognizable cause of action under, first, federal law and, second, state law.[1] Doe characterizes the five counts of her complaint as follows. Count I is a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Count I is based on a violation of § 1962(a), which prohibits using or investing racketeering income in an enterprise. Count II alleges a RICO claim for violating § 1962(c) which prohibits conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering. Count III and IV are pendent state law claims for breach of fiduciary duty and intentional infliction of emotional distress. Count I is brought against both defendants. Counts II through IV are only against Roe. Count V is a pendent state law claim against Roe and Roe for *respondeat superior* liability based on its employee's conduct alleged in Counts III and IV.

In April 1983, Doe met Roe at a social gathering. After inquiring about her divorce proceeding, Roe suggested Doe's counsel was inadequate and that he could do a better job. In June 1983, Doe went to Roe's office to discuss her divorce. Roe again derided the work of Doe's counsel and she decided to hire Roe instead. In July, Doe paid a $7,500 retainer.[2] No written agreement was entered into, but Roe stated that if further fees were necessary, they would be paid by Doe's husband. Then, as now, Doe had no substantial assets of her own. She would not have hired Roe if she knew additional payments would be required.

Doe placed great trust in Roe because he was her attorney and because she understood he had an outstanding reputation. Additionally, because of the emotionally trying nature of the divorce proceeding, Roe advised Doe on personal matters as well as legal matters. As a result, Doe developed a psychological dependency on Roe. On her second visit to Roe's office, Roe made sexual advances. Doe initially resisted, but Roe persisted. "Although Plaintiff felt repulsed by ROE's sexual advances, she submitted because of her fear that otherwise he would not represent her and that since she could not afford a retainer fee to hire a third counsel in her divorce case, she might go unrepresented and lose both custody of her child and the opportunity for financial security for herself and her child." From 1983 through 1988 Doe continued to submit to Roe's sexual demands, at his offices, in her home, and at other locations. Doe continued to do so because of both her emotional dependency

---

1. If plaintiff has no cognizable federal claim, then the pendent state law claims will be dismissed for lack of subject matter jurisdiction without considering their merits. *See Maguire v. Marquette University*, 814 F.2d 1213, 1218 (7th Cir.1987). Since both parties have assumed that Illinois law applies to the pendent claims in this case, the substantive law of Illinois would be applied to the pendent state law claims. *See Shore v. Dandurand*, 875 F.2d 656, 659 (7th Cir.1989).

2. Prior to terminating representation by her original counsel, Doe had paid him $9,350.

and her fear of what would happen if she lost Roe's legal representation.

In May 1985, shortly after a court appearance in the divorce case, Doe and Roe returned to Doe's home where they engaged in sexual relations believing no one else was at the home. Doe's husband, however, was in the home and discovered them in the bedroom engaged in sexual activity. As a result of this discovery, Doe's husband determined that he would not pay Doe's attorney's fees. Roe subsequently failed to seek to have Doe's husband pay the fees out of fear that the husband would reveal in court his knowledge of Roe's relationship with Doe. In June 1985, Roe had Doe sign a settlement agreement without explaining it to her or giving her an adequate opportunity to read it. The agreement provided that Doe would pay Roe's fees. A month latter, Roe used the settlement agreement as a means of placing a lien on Doe's residence without informing Doe that he had done so.[3]

In May 1986, Doe received a letter from Roe and Roe's bookkeeper, written at the direction of Roe, informing Doe she owed a total of $6,500 for legal services. In the letter, Doe is called a "bitch" and is informed that if she does not pay, the members of the firm "have very 'Italian' friends who could be eye witnesses to some slight injury on your part. I don't need to inform you [Doe] that this bill should be paid upon receipt, as I don't want to read your name in the paper, and I don't mean on the funny pages!" It is stated that Roe "has informed me [the bookkeeper] that if you do not wish to pay your bill in full, he will work out with you in 'other ways' to have you pay off your balance. He will be in 'touch' with you in the near future." Out of fear for her personal safety and after being informed she really owed an additional $40,000, Doe agreed to continue to have sexual relations with Roe. He then filed a satisfaction and release of judgment as to the lien on the residence and other amounts allegedly due.

Doe subsequently asked Roe to represent her with respect to difficulties concerning enforcement of her divorce decree. Roe agreed to represent her on the "same terms," meaning the price of continued representation would be submission to Roe's sexual demands. It is alleged that "[b]ecause Plaintiff continued in her feelings of dependence upon ROE for legal representation and emotional support to the extent that she felt under ROE's total psychological domination, because she did not know that ROE's insistence on sex in exchange for legal representation violated his fiduciary duties to her, because she was frightened by what ROE might do should she break off their relationship, and because she did not have the funds to pay his fees, Plaintiff continued to submit to ROE's sexual demands until on or about October, 1988."

In February 1989, Doe learned that another female divorce client of Roe had brought a lawsuit against him alleging that he had violated his fiduciary duties by having a sexual relationship with the client. As a result, Doe came to the belief that Roe had violated his fiduciary duties to her and that she had an alternative to continuing to submit to his sexual demands.

Doe claims that Roe failed to inform her of the following matters which she did not learn until she consulted another attorney: (a) that she was entitled to zealous representation without submitting to sexual demands; (b) that the sexual relationship was potentially harmful to her interests in the divorce case; (c) that there was a "substantial risk" that her submission to Roe's sexual demands was the result of the transference phenomenon by which a client can project inappropriate feelings of dependence onto the attorney and suffer serious emotional injury as a result of any sexual relationship that may develop; (d) that the sexual relationship created a potential con-

3. Plaintiff alleges the settlement and placement of the lien occurred in June and July 1984. Assuming, however, that the complaint is written chronologically and that the settlement occurred subsequent to the husband's discovery of Roe and Doe in bed, it appears that the reference to 1984 was an error and that the settlement and placing of the lien occurred in June and July 1985.

flict of interest in Roe's representation of her; (e) that Roe engaged in sexual relations with numerous sexual partners, including at "swinger" parties, and that posed an "unusual risk" of life-threatening sexually transmitted infection; and (f) that the adulterous relationship with Roe subjected Doe to potential criminal prosecution. Additionally, Roe failed to inform Doe, either before or after receiving the retainer fee, that it was his regular practice to attempt to persuade female divorce clients that he found attractive to submit to his sexual demands and that was intended with Doe from the beginning. Furthermore, at the time Roe promised to charge no more than the retainer fee, he already intended to seek to collect fees beyond that amount. It is alleged that "[A]s a result of his knowing and intentional failure to inform Plaintiff of the foregoing facts, ROE succeeded in deceiving Plaintiff into falsely believing that her sexual submission was not harmful to her interests and that such submission was necessary both in order to receive his representation and in order to receive his emotional support while undergoing the emotional difficulties of divorce."

In November 1989, after Doe's present attorney first wrote a letter to Roe indicating Doe would seek redress for her injuries and that Roe should not contact Doe except through counsel, Roe nevertheless made threatening phone calls directly to Doe. Among other threats, he threatened to "rip Plaintiff to shreds," to "get everyone he knew to make her look terrible—like a slut," and to "get her for this." Roe also informed Doe "she should be concerned about her family, her reputation, and the success of her business." Roe continued to make harassing phone calls to Doe at her house. Also, in December 1989, he sent her a note stating "DON'T DO THIS TO ME/YOU'LL BE SORRY." In January 1990, Roe approached Doe on a sidewalk in downtown Chicago and shouted obscene epithets at her. On an afternoon in June 1990, a middle-aged male in business attire, who was acting at Roe's direction, approached Doe at an intersection in downtown Chicago and made a vulgar sexual proposition. In September, the same man approached her in downtown Chicago and warned her she was "in over her head" and that he had supposedly embarrassing evidence about her that he could expose. Doe continues to receive threatening phone calls from anonymous persons and frequent early morning phone calls in which the person says nothing. The emotional distress caused by this pattern of harassment has caused her to miss work and to expend money to purchase a security system.

The attorney representing Doe in the present action [4] is employed by the Northwestern University Law School Legal Clinic. Northwestern University pays the attorney's salary and he represents Doe without any compensation from Doe. Although Northwestern University is the attorney's employer, it does not purport to direct or regulate the professional judgment of the attorneys at the Legal Clinic. On October 4, 1990, Roe wrote to Northwestern University's general counsel threatening to sue the University for malicious prosecution after the successful dismissal of the present lawsuit unless the University intervened to have the lawsuit dismissed. Prior to the letter, Roe is alleged to have had a friend who is a "prominent" Northwestern University Law School alumnus contact the University's general counsel regarding Doe's continued representation by the Legal Clinic. This alumnus had also contacted Northwestern University Law School's current dean and former dean. This attempt to influence Doe's counsel's employer is characterized as a violation of Illinois's Rules of Professional Conduct Rules 8.4(a)(2) and 5.4(c).

The foregoing matters are characterized by plaintiff as a scheme to defraud her of money, property, and honest services in violation of the federal mail and wire fraud

---

**4.** He also represented Doe in state court proceedings that have been dismissed and he represented another former client of Roe in another state court suit involving Roe's sexual relationship with that client.

statutes.[5] *See* 18 U.S.C. §§ 1341, 1343, 1346. Such violations can fall within the RICO definition of a racketeering act. *See* 18 U.S.C. § 1961(1)(B). Plaintiff claims that Roe "implemented this fraudulent scheme first by failing to disclose to Plaintiff information which he had a duty to disclose in order to enable Plaintiff to protect her interests and, second, by exerting undue influence over her in order to gain personal advantage at her expense." Roe is also characterized as engaging "in an additional fraudulent scheme by implementing a campaign of intimidation against plaintiff in order to prevent her from seeking legal recourse which would have revealed his fraudulent activities." The allegations against Roe are also characterized as being multiple acts of extortion violating Ill.Rev.Stat. ch. 38, ¶ 12–6 and are claimed to constitute racketeering acts. *See* 18 U.S.C. § 1961(1)(A). The attempts to influence Doe's counsel's employer are characterized as an attempt to obstruct and impede the due administration of justice in violation of 18 U.S.C. § 1503 and bribery in violation of Ill.Rev.Stat. ch. 38, ¶ 29A–1. Both obstruction of justice, *see* 18 U.S.C. § 1961(1)(B), and bribery in violation of state law, *see id.* § 1961(1)(A), can constitute racketeering acts under RICO.

Doe alleges that Roe has implemented similar schemes of fraudulent activity on other occasions not involving Doe. Specifically, Doe refers to Roe's treatment of three other female divorce clients, but also generally alleges that they are not the only victims. In December 1983 and January 1984, J.M. submitted to Roe's demands for sexual relations out of fear she would not receive adequate representation if she did not and because she felt dependent upon him as her guide and counselor during that stressful period. Roe failed to disclose to J.M. the same matters that he failed to disclose to Doe. J.M. was also represented by the same attorney that represents Doe. Roe sought to further this scheme to defraud by "threatening to destroy the Northwestern University Clinic and having two of his wealthy clients who are gradu-

ates and major contributors to the Northwestern Law School cease contributing to the School." Roe also falsely informed the Attorney Registration and Disciplinary Commission (the "ARDC") that he had not had sexual relations with J.M. The mails are said to have been used in executing this scheme.

It is charged that in August and September 1981, Roe informed Joanne P. that his bill would be $8,500, but would not provide an itemized bill. When she refused to pay without the itemization, he told her he would not get her divorce decree entered until she paid. Joanne then paid the bill, but the final decree entered provided she owed Roe $10,000 for his services. This far exceeded any amount legitimately due to him. In proceedings to vacate the judgment for fees and in proceedings before the ARDC, Roe made repeated false statements and used the mails in executing this scheme.

It is charged that in April 1987, Mary H. sought representation from Roe and Roe. She was told the firm would collect all fees from her husband, as the firm does "for all our ladies." A retainer fee was required, but she was told it would be returned when the fees were collected from her husband. Shortly before the prove-up in her divorce proceeding, Roe informed Mary she had to consent to a $5,000 lien on her house. She refused, but did accede to signing a draft marital settlement agreement in which she agreed to pay Roe and Roe $2,500. She only agreed to make this additional payment because she believed her divorce would not be finalized if she did not agree to make the payment. Defendants are said to have used the mails in executing this scheme.

It is additionally alleged that Roe furthered his scheme to defraud Joanne and Mary by knowingly violating his fiduciary duty to inform them (a) that they had right to a hearing on the attorney fee issue; (b) of the nature and consequences of signing the agreed orders; and (c) of the work he

---

**5.** This summary of the factual allegations does not include all of the specific dates alleged by plaintiff nor all the mailings and phone calls alleged by plaintiff.

did to justify the fee charged. Roe also furthered the scheme by pressuring them during critical moments in the lawsuit and obtaining their consent through undue influence. It is also alleged that this is defendants' standard practice with divorce clients that they believe have neither the economic resources nor psychological independence to withstand such pressure.

■ Section 1964(c) of RICO provides that "any person injured in his business or property by reason of a" RICO violation may bring a civil suit for damages. Defendants argue Doe has not been injured in her business or property. Physical injury and mental suffering do not constitute RICO injury; there must be injury to business or property. *See Rylewicz v. Beaton Services, Inc.*, 888 F.2d 1175, 1180 (7th Cir.1989); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1122, 107 L.Ed.2d 1029, —— U.S. ——, 110 S.Ct. 1473, 108 L.Ed.2d 611 (1990); *McMurtry v. Brasfield*, 654 F.Supp. 1222, 1224–25 (E.D.Va. 1987). Therefore, the personal injuries that Doe alleges cannot constitute RICO injury. Additionally, any injury to property must be proximately caused by the racketeering acts. *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 686 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990); *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253–54 (7th Cir.1989); *Arzuaga–Collazo v. Oriental Federal Savings Bank*, 913 F.2d 5, 7 (1st Cir.1990). Plaintiff points to various allegations that she argues constitute injury to property.[6] In considering whether a loss of property has been adequately alleged, it will be assumed—without deciding the issue—that a pattern of racketeering activity including schemes to defraud constituting predicate acts of mail and wire fraud have been adequately alleged.

Plaintiff argues that the $7,500 retainer paid to Roe was, at least in part, a loss of property since she could have retained a less expensive attorney. Also, in switching to Roe, she incurred additional expenses since he had to duplicate some of the work she had already paid her first attorney $9,350 to perform. If Doe was fraudulently induced[7] into retaining Roe, all or, more likely, parts of these two payments would constitute a loss of property as a result of the RICO predicate acts. The actions of Roe allegedly constituting the scheme to defraud generally occurred after Roe had been retained and are alleged to cause injury other than the loss of the retainer fee and the payment to the first attorney. The only racketeering acts that are claimed to have caused the decision to retain Roe is Roe's failure to disclose in advance his intention to follow his regular practice of demanding sexual favors from clients such as Doe and his intention to seek to obtain a greater fee than the amount he initially promised to charge.

The alleged misrepresentations as to the actual fee Roe would charge cannot be considered a cause of the loss of the $7,500 or the amount paid to the first attorney. At the cost of $7,500, Doe was willing to retain Roe and discharge her first attorney. If Roe intended to collect money or sexual services beyond the $7,500 promised, there is no injury to property caused by the misrepresentations except to the extent that he collected money (or other property) in excess of the $7,500 retainer. Loss of the $7,500 retainer and the payment to the prior attorney cannot be considered to have been caused by the misrepresentations as to the full fee that would be charged; only additional charges could be considered a loss caused by the misrepresentations as to the fee to be charged. As is discussed below, the "charges" beyond the promised $7,500 fee did not result in injury to property.

Plaintiff claims that the scheme to defraud resulted in a loss of property in that Roe failed to adequately pursue her inter-

---

6. Although the allegations also appear elsewhere, the purported injuries to property are summarized in paragraphs 43, 50, and 51 of the Amended Complaint.

7. Doe does not claim these two injuries were caused by the alleged extortion; she only argues they were caused by the scheme to defraud.

ests in the divorce litigation out of fear that Doe's husband would reveal Roe's relationship with Doe. Doe conclusorily alleges that this resulted in plaintiff failing to pursue payment of Doe's attorney's fees by her husband.[8] Although plaintiff alleges that Mary H. was told that Roe and Roe, in all cases where it is representing the wife, collects all fees, including the initial retainer, from the husband, the allegations as to Doe are clear that she was only told that "further" fees beyond the retainer fee would be paid by her husband. Amended Complaint ¶¶ 10, 22. The complaint is read as alleging that, had he pressed further, Roe could have obtained a settlement or judgment requiring Doe's husband to pay Roe's fees beyond the amount of the retainer.[9]

A recent Seventh Circuit opinion indicates that loss of a damages claim due to an attorney's malfeasance can constitute loss of property under RICO. *See Hartz v. Friedman,* 919 F.2d 469, 474 (7th Cir. 1990).[10] If Doe had been deprived of having her husband compensate her for the $7,500 she actually paid out or if she had paid additional fees for which he did not compensate her, then the RICO injury to property requirement would be satisfied. Doe, however, was never required to make additional monetary payments. Although presented with bills for additional fees, she "paid" them off with sexual services, not money. Thus, the nonzealous representation resulted in further personal injury, not injury to property. Plaintiff argues that she was deprived of the payment from her husband, which was a loss of property enabling Roe to pressure her into further sexual relations due to a lack of financial resources to pay his bills. This characterization does not change the fact that Doe's actual injury was the personal injury of sexual servitude, not a loss of property. She was never required to pay the additional bills with additional property. For the same reason, the judgment for attorney's fees and placement of the lien on Doe's residence did not constitute injury to property since they were paid off with sexual services, not money or other property.

■ Plaintiff argues that the nonsexual companionship services that she provided to Roe are a property interest that she lost. Except possibly where there is an actual employment relationship, *see, e.g., Curley v. Cumberland Farms Dairy, Inc.,* 728 F.Supp. 1123, 1140 (D.N.J.1990), lack of compensation for services will not be considered injury to business or property under RICO.

■ Plaintiff argues that her missing work as a result of the harassment from Roe and her need to expend money for a security system constitute loss of property under RICO. However, economic aspects of personal injuries and injuries incidental to the racketeering acts are not compensable under RICO. *See Rylewicz v. Beaton Services, Ltd.,* 698 F.Supp. 1391, 1396

---

**8.** There is no express allegation that Doe had any legal entitlement to having her husband pay her attorney's fees nor are there any allegations of the underlying facts of the divorce case that would support an inference that Doe was likely to obtain that benefit if Roe had pressed for it on her behalf. There is an allegation that Doe's husband had indicated a willingness to pay Roe's fees prior to his discovering them in bed together. These allegations are insufficient to support a claim that Doe's divorce case suffered by inadequate representation. *Cf. Martin v. Davies,* 917 F.2d 336, 340 (7th Cir.1990) (*pro se* allegations of harm to prisoner's pending cases due to denial of access to court were conclusory and therefore insufficient. However, it will be assumed that, had Roe more zealously represented Doe, Doe could have succeeded at having her husband pay some of Roe's fees.

**9.** Paragraphs 18, 19, 43(a), and 62(c) do not specify whether Doe's husband might have been required to pay the full amount of Roe's fee or just the amount of fees in addition to the retainer. In her brief, Doe argues that the failure to zealously pursue her interests resulted in Roe being able to exert economic leverage over Doe in order to pressure her to continue their sexual relationship. Plaintiff's Memorandum at 5. There is no argument that the less than zealous representation resulted in the loss of not having the $7,500 retainer paid by the Doe's husband. In light of the arguments in the brief and the allegations in ¶¶ 10 and 22, the ambiguity in ¶¶ 18, 19, 43(a), and 62(c) is resolved as stated in the text.

**10.** Whether *Hartz* so holds or merely assumed this to be true is unclear since the claim was found to be otherwise defective.

(N.D.Ill.1988), *aff'd*, 888 F.2d 1175, 1180 (7th Cir.1989); *Grogan v. Platt*, 835 F.2d 844 (11th Cir.), *cert. denied*, 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988); *Local 355 v. Pier 66 Co.*, 599 F.Supp. 761, 765 (S.D.Fla.1984).[11]

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that violation of the mail fraud statute required that there be a scheme to obtain money or property; a scheme to deprive another of intangible rights such as honest services could not constitute mail fraud.[12] Plaintiff relies on Justice Stevens's dissent in which he stated that, even in light of *McNally*, "when a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for." *Id.* at 377 n. 10, 107 S.Ct. at 2891 n. 10 (Stevens, J., dissenting). Plaintiff argues this is particularly applicable when the offender is a private employee, not a government employee. The next term after *McNally* was issued, however, a unanimous Court indicated otherwise. In *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court held that mail fraud violations include deprivations of intangible property, including intangible property such as confidential business information of a newspaper. The Court distinguished *McNally* stating, "The Journal, as Winans' employer, was defrauded of much more than its contractual right to his honest and faithful service, an interest too ethereal in itself to

fall within the protection of the mail fraud statute, ...." *Id.* 484 U.S. at 25, 108 S.Ct. at 320. To the extent Roe committed fiduciary violations as part of a scheme to defraud, those violations would not constitute a loss of property.

Since plaintiff has not alleged an injury to business or property as required by 18 U.S.C. § 1964(c), her RICO claims must fail. Since the RICO claims must be dismissed, jurisdiction over the pendent state law claims will not be retained. While plaintiff may adequately state claims for breach of fiduciary duty[13] and intentional infliction of emotional distress, absent a basis for federal jurisdiction, those claims must be pursued in state court and the determination of the viability of those claims must be left for any such proceeding.

IT IS THEREFORE ORDERED that defendants' motion to dismiss is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing Counts I and II of plaintiff's amended complaint with prejudice and dismissing Counts III, IV and V of plaintiff's amended complaint without prejudice for lack of subject matter jurisdiction.

---

**11.** Plaintiff alleges in her amended complaint, but does not argue in her brief, that she also suffered a property loss in that, as a result of Roe's pressure on Northwestern University, it was necessary for her to pay another attorney to advise her regarding her present attorney's potential conflict of interest. This is also an incidental injury, noncompensable under RICO. *See Local 355, supra.*

**12.** Effective November 18, 1988, Congress amended the mail and wire fraud statutes to provide that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. To the limited extent that plaintiff alleges mail or wire fraud occurring November 18, 1988 or later, the loss of

honest services might satisfy those statutes, and therefore constitute racketeering acts, but they would not be a direct basis for civil RICO liability since § 1964(c)'s requirement of injury to property would not be satisfied. In other words plaintiff could not be compensated under RICO for the loss of honest services, but such fraud could be evidence of a pattern of racketeering activity supporting a claim for civil liability.

**13.** The recent decision of *Suppressed v. Suppressed*, 206 Ill.App.3d 918, 151 Ill.Dec. 830, 565 N.E.2d 101 (1990), which apparently is J.M.'s suit against Roe, is factually distinct from the present case. Whether the additional facts present in Doe's case make out a cognizable state law breach of fiduciary duty claim is not resolved by today's ruling.