**Jane DOE, Plaintiff–Appellant,**

**v.**

**John ROE, and Roe and Roe, Limited, Defendants–Appellees.**

**No. 91–1289.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 13, 1991.

Decided March 9, 1992.

Rehearing En Banc Denied May 4, 1992.

John S. Elson (argued), Chicago, Ill., for plaintiff-appellant.

Stephen R. Swofford, Bruce L. Carmen, Thomas P. McGarry (argued), D. Kendall Griffith, Hinshaw & Culbertson, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, WOOD, Jr.,* and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Time and again, federal courts have emphasized that RICO (the Racketeer Influenced and Corrupt Organizations Act, 18

---

* Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case.

U.S.C. § 1961 *et seq.*) was designed as a flexible tool for fighting organized crime in the United States. Equally well known are the novel—and often imaginative—ways in which civil plaintiffs have attempted to use this flexibility in order to exploit RICO's provisions for treble damages and attorney's fees. In this appeal, we are asked to determine whether a plaintiff may bring a civil action under RICO where she alleges that her divorce attorney defrauded her into having sexual relations with him in lieu of payment for his legal services. We hold that RICO cannot encompass such a claim.

### I.

The complaint alleges the following facts, which we make explicitly clear we are required to take as true for purposes of this appeal. *Wooten v. Loshbough,* 951 F.2d 768, 769 (7th Cir.1991).

In April 1983, Jane Doe first met attorney John Roe at a social gathering. After inquiring about Doe's ongoing divorce proceedings, Roe indicated that he could represent her more effectively than her current attorney, and suggested that she drop by his office to discuss the matter further. In June 1983, Doe followed up on their conversation and visited Roe at his office, whereupon he repeated his assertions that he was an extremely influential divorce attorney who could provide her with better legal services. Relying on these assurances, Doe asked Roe to take over her case and paid him his requested retainer fee of $7,500. No written agreement concerning Roe's fees was executed, but Roe expressly stated that any additional fees owing him would be paid by Doe's husband—a representation Doe deemed critical since she lacked the financial means to make further payments.

As Doe's divorce proceedings became more emotionally trying, she began to seek Roe's counselling on her personal affairs in addition to her legal problems, and soon she developed a psychological dependency on his advice. Playing on Doe's vulnerability, Roe made sexual overtures towards Doe during their second appointment at his office. At first Doe attempted to spurn Roe's advances by pushing him away from her. When Roe persisted, however, she submitted to his sexual demands because of her anxiety that he would otherwise discontinue his work on her case, leaving her unrepresented and unable to afford a retainer for a third attorney. Above all else, Doe did not want to risk losing the custody of her child and the opportunity to obtain some financial security for their future.

From 1983 to 1989, Roe continued to represent Doe in her divorce and on post-decree matters. Throughout that same period, Doe yielded to Roe's sexual advances on repeated occasions at Roe's office, Doe's home and at other locations. However, his demands were not limited to sexual favors. Frequently, he asked her to prepare meals for him at her home. He also required her to accompany him at various outings and social events. Given her scant economic resources, Doe saw no alternative but to comply with all of his wishes.

In May 1984, following a court appearance in the divorce case, Roe drove Doe to her home where they engaged in sexual relations. While *in flagrante delicto,* they were interrupted by Doe's husband who unexpectedly had appeared in the bedroom. Outraged with Roe's sexual activity with his wife, Doe's husband refused to pay any of Roe's attorney's fees. Roe, thereafter, refrained from asking the court to order Doe's husband to pay such fees because Roe feared that he might reveal his knowledge of his sexual relationship with Doe, thereby subjecting himself to personal embarrassment and possible professional discipline.

But Roe demanded full value for his legal services. In June 1984, while Doe was waiting in court just before a hearing on her divorce, Roe presented her with a written settlement agreement which was to be submitted for the court's approval. The agreement provided, *inter alia,* that Roe would be authorized to obtain a judgment lien against Doe for any additional attorney's fees owing him. Roe recommended that she sign the agreement, but he did not

explain to her any of its terms or give her an opportunity to read it. Mistakenly believing that her retainer fee remained sufficient to cover her debts to Roe, Doe followed his advice and signed the document without hesitation. Only a month later, Roe used this agreement as a basis for entering a lien judgment against her home for $2,500; at that time, however, Doe had never been told that she owed Roe additional legal payments, nor was she informed that a lien had been placed against her home to secure those obligations.

In late May 1986, Doe received a bill for Roe's legal services in the amount of $6,500, comprising $4,000 owing towards her original retainer, and the $2,500 she incurred in additional fees. Enclosed with the bill was a letter informing Doe that if she did not pay this balance, she might suffer "some slight injury." The letter also noted that if Doe did not wish to pay her bill in full, Roe would be willing to work out "other ways" to have her pay off her balance, and that he would be "in touch" with her in the near future. Out of fear for her own personal safety, and because she was unable to make payment in full, Doe agreed to continue her sexual relations with Roe. In turn, Roe filed a satisfaction and release of judgment as to the lien on her residence and other amounts allegedly due—in spite of her failure to pay him anything toward the $2,500 judgment.

Following entry of the divorce decree, Doe asked Roe to represent her in regard to difficulties which she was experiencing with respect to the decree's enforcement. He agreed to do so on the condition that his terms for "compensation" remain the same. Understandably, Doe took this statement to mean that the price of his continued representation would be further submission to Roe's sexual demands. However, because she still felt dependent on Roe for legal representation and emotional support, and because she was also frightened by what Roe might do if she should break off their relationship, she continued to engage in sexual activity with Roe until October 1988.

In February 1989, Doe learned that another of Roe's female divorce clients had brought a lawsuit against Roe for breach of fiduciary duty arising from his sexual activity with her while representing her in a divorce action. Thinking that she might have a similar claim for redress, Doe terminated her employment of Roe, hired a third attorney, and then informed Roe that any further contact with her should be directed to her new counsel. Angered by this unanticipated turn of events, Roe made a series of phone calls to Doe in which he threatened her with dire consequences if she pursued the matter. Specifically, Roe threatened to "rip [Doe] to shreds," to "get everyone he knew to make her look terrible—like a slut," and to "get her for this." Roe also told Doe that she should be worried about her family, her reputation and the success of her business.

In December 1989, Roe sent Doe a typewritten letter in which he wrote "DON'T DO THIS TO ME/YOU'LL BE SORRY." And, on January 29, 1990, Roe came up to her on a sidewalk in the Chicago Loop and shouted obscene epithets at her. Other acts of intimidation which Doe believed were directed by Roe included threats made against her by an unknown individual who twice approached her while she was walking in downtown Chicago, as well as numerous anonymous telephone calls to her unlisted phone number in which the caller either remained silent or threatened physical harm. As a result of this pattern of harassment and intimidation, Doe missed work for several days and had to purchase an enhanced security system for her car and garage.

Roe's scare tactics were not targeted solely on Doe, however. After learning that Doe's counsel was a legal services lawyer in the Northwestern University Legal Clinic, he informed the General Counsel for Northwestern University that he would hold the University accountable for damages unless it made Doe's counsel withdraw from her case. When this failed, he asked a friend—a prominent alumnus of the Northwestern University Law School— to make inquiries about the Clinic's representation of Doe. Roe and his agents also

contacted the Dean of the Law School in order to pressure the Clinic into withdrawing from Doe's lawsuit.

## II.

Based on the foregoing allegations, Doe brought suit under RICO alleging that Roe defrauded her of money, property and honest services in violation of the federal mail and wire fraud statutes in 18 U.S.C. §§ 1341, 1343, 1346—all offenses which fall within the RICO definition of a racketeering act.[1] *See* 18 U.S.C. § 1961(1)(B). According to Doe's complaint, Roe "implemented this fraudulent scheme first by failing to disclose to Plaintiff information which he had a duty to disclose in order to enable Plaintiff to protect her interests and, second, by exerting undue influence over her in order to gain personal advantage at her expense." The complaint also charged Roe with engaging "in an additional fraudulent scheme by implementing a campaign of intimidation against Plaintiff in order to prevent her from seeking legal recourse which would have revealed his fraudulent activities." Other acts cited in Roe's pattern of racketeering included: extortion in violation of ILL.REV.STAT. ch. 48, § 12–6; obstruction of justice in violation of 18 U.S.C. § 1503; and bribery in violation of ILL.REV.STAT. ch. 38, § 29A–1.[2]

The district court dismissed Doe's complaint on the grounds that it did not allege an injury to "business or property by reason of a" RICO violation, 756 F.Supp. 353. *See* 18 U.S.C. § 1964(c). The court first held that Roe's failure to inform Doe that he regularly demanded sexual favors from his clients, as well as greater fees than originally agreed to, did not injure her property by reducing the value of both her $7,500 retainer fee and the fee she had already paid her first attorney. In the view of the district court, Doe would have

suffered such an injury only if Roe had in fact collected money or other property in excess of the retainer.

The district court likewise rejected Doe's claim that Roe's fraudulent conduct resulted in a loss of property in that she lost the right to her husband's payment of attorney's fees, which in turn led to an entry of a judgment and lien for his fees. In reaching this conclusion, the court pointed out that Doe never paid Roe money to satisfy his judgment or his bills for additional fees, but rather paid only in "sexual servitude"—a personal, not property, injury.

Finally, the district court determined that the following three additional injuries alleged by Doe did not constitute compensable property deprivations under RICO § 1964(c): (1) her loss of pay and expenditures for her security systems; (2) the companionship services she provided Roe; and (3) her costs in retaining a new lawyer. According to the court, these injuries, though economic in nature, were simply incidental to Roe's alleged racketeering conduct and thus were not recoverable.[3]

## III.

■ To support a civil RICO claim, the plaintiff must allege an injury to "business or property by reason of" a racketeering violation. 18 U.S.C. § 1964(c); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985). The terms "business or property" are, of course, words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom. *Rylewicz v. Beaton Services*, 888 F.2d 1175, 1180 (7th Cir.1989). Not surprisingly, all other courts construing this language have likewise concluded that a civil RICO action cannot be premised solely upon personal or emotional injuries. *Bankers Trust Co. v.*

1. Roe & Roe Ltd. were joined as party defendants based on their use of income which Roe derived from his pattern of racketeering activity. 18 U.S.C. § 1962(c).

2. Doe also alleged two pendent state claims against Roe sounding in breach of fiduciary duty and intentional infliction of emotional distress. Roe & Roe Ltd. were likewise joined as

party defendants as to these counts under a theory of respondeat superior. *See* ILL.REV.STAT. ch. 32, § 415–8 (a professional services corporation is liable for the negligent or wrongful acts or misconduct committed by any of its officers while working on behalf of the corporation).

3. Doe's pendent state claims were subsequently dismissed for lack of subject matter jurisdiction.

*Rhoades,* 741 F.2d 511, 515 (2d Cir.1984), *vacated on other grounds,* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985); *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1169 (3rd Cir.1987); *Fleischhauer v. Feltner,* 879 F.2d 1290, 1300 (6th Cir.1989), *cert. denied,* 493 U.S. 1074, 494 U.S. 1027, 110 S.Ct. 1122, 1473, 107 L.Ed.2d 1029, 108 L.Ed.2d 611 (1990); *Berg v. First State Ins. Co.,* 915 F.2d 460, 464 (9th Cir.1990); *Grogan v. Platt,* 835 F.2d 844, 846 (11th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988).

Doe does not dispute that personal injuries, such as mental anguish or pain and suffering, fall outside the rubric of "business or property." She maintains, however, that the injuries she suffered at the hands of Roe were recoverable property injuries within the meaning of RICO § 1964(c). These injuries, as alleged by Doe, may be classified into three general categories: (1) the sexual labor Doe provided in forgiveness of her debts to Roe; (2) payment of an inflated fee, resulting from Roe's failure to inform her that Doe's sexual services would be required; and (3) other miscellaneous expenses which Doe incurred both during and after her relationship with Roe. We address the sufficiency of each of these asserted property injuries in turn.

■ Doe first argues that Roe's fraudulent inducement of their sexual activity resulted in the loss of her claim to her husband's payment of her attorney's fees, and that consequently she felt compelled to satisfy her debts for Roe's additional fees by complying with his demands for payment in sexual favors rather than in money. According to Doe, the fact that Roe forgave her debts demonstrates that her sexual activity had an intrinsic value commensurate with the money she otherwise would had to have paid. Since the loss of money is a form of property loss, Doe concludes that the district court erroneously determined that she suffered no property deprivation.

■ While federal law governs most issues under RICO, whether a particular interest amounts to property is quintessentially a question of state law. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982) ("The hallmark of property ... is an individual entitlement grounded in state law...."); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (property interests "are created and their dimensions are defined by" sources "such as state law."). Under Illinois law, individuals such as Doe certainly have a compensable property interest in their toil and labor. *Mowrey v. Mowrey,* 328 Ill.App. 92, 65 N.E.2d 234, 238 (1946) (" [I]t conclusively appears that the right to labor is a property right and that the property which every man has in his own labor is the highest form of property."). But not in every form of labor. What Doe avoids in her analysis is that her "sexual labor" has no legal value in Illinois, where the courts have long held that contracts for sexual services are unenforceable as a matter of public policy. *Hewitt v. Hewitt,* 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204 (1979). This makes sound legal sense. Recognizing sexual labor as a service which can be bought, sold and exchanged would open a proverbial pandora's box of issues involving market valuation, let alone the collateral moral and societal considerations. A step off this precipice we are unwilling to take.

Of course, we are not required to adopt a state interpretation of "business or property" if it would contravene Congress' intent in enacting RICO. *Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946) (federal courts not required to adopt state definition of "real" versus "personal" property where Congressional purposes underlying Reconstruction Finance Corporation Act would be evaded). But this concern need not detain us here. Congress enacted civil RICO primarily to prevent organized crime from obtaining a foothold in legitimate business. We find it impossible to believe that Congress intended to thwart such criminal activity by recognizing a civil action to acquire a monetary recovery for the value of one's sexual activity.

■ So we turn to Doe's argument concerning her second purported property inju-

ry, which runs something like this: by concealing his fraudulent practice of both requiring sexual services and demanding unbargained-for attorney's fees, Roe caused her to overvalue the worth of her contract with him, and therefore, pay a greater retainer fee than she otherwise would have. Doe also contends that Roe's failure to inform her of his scheme led her to abandon her original attorney, thereby requiring her to pay Roe additional money to duplicate some of the work her prior attorney had already completed. To support her claim that she had a protected property interest in the information Roe withheld from her, Doe cites *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), where the Supreme Court concluded that a Wall Street Journal reporter's use of confidential Journal information for personal profit constituted an injury to the Journal's property for purposes of the mail fraud statute. 18 U.S.C. § 1341.

This argument fares no better. Even assuming that Roe misrepresented the total fee he intended to charge her, Doe's allegations do not indicate that she suffered any legitimate property loss by relying on these misrepresentations. Put simply, there is no indication that Roe collected any money or other property from Doe beyond his stated retainer of $7,500. Claiming that Roe's services were "overvalued" on account of her uncompensated sexual labor does not establish a property injury, for that presupposes her labor had an ascertainable legal value to begin with—a premise we have already discarded above. Nor can Doe seriously claim recovery for the value of her first attorney's services; in deciding to substitute her counsel, Doe relied on Roe's assurance that his retainer was the only sum she needed to provide. That in fact proved to be all she paid.

*Carpenter* is not to the contrary. Roe's undisclosed sexual predilections towards his female clientele could scarcely be viewed as "confidential information" which he was under a duty to reveal on pain of legal malpractice. And even if the withholding of such "information" was legally actionable, RICO is not the appropriate vehicle. Roe's alleged misconduct could at best be characterized as a breach of his fiduciary duty to provide honest and faithful services—an interest which the *Carpenter* Court itself explicitly stated was "too ethereal in itself to fall within the protection of the mail fraud statute...." *Id.* at 25, 108 S.Ct. at 320.[4] And, as we have already suggested above, these fiduciary violations did not harm Doe in a commercial or proprietary sense; any overvaluation of Roe's legal services did not result in any economic loss to Doe. Without more, Doe cannot allege a legitimate business or property interest under RICO.[5]

■ Thus, we come to Doe's final allegations of property injuries—a group of miscellaneous expenditures which Doe incurred during her association with Roe, as well as other costs following the termination of their relationship. These injuries included: (1) her loss of pay and expenses for increased personal security; (2) the companionship services she was defrauded

---

4. In *Suppressed v. Suppressed*, 206 Ill.App.3d 918, 151 Ill.Dec. 830, 565 N.E.2d 101 (1990), the Illinois Appellate Court addressed this issue in the context of a legal malpractice suit brought against Roe by another of his female divorce clients. There the court held that her allegations of sexual misconduct did not state a cause of action for breach of fiduciary duty under Illinois law, for she failed to state "legally sufficient facts concerning the breach of a fiduciary duty owed to her by defendant." *Id.* 151 Ill.Dec. at 834, 565 N.E.2d at 105. Her suit, however, is factually distinct from the instant case. Whether the additional facts present in Doe's case make out a cognizable claim for breach of fiduciary duty is not resolved by today's ruling.

5. Effective November 18, 1988, Congress amended the mail and wire fraud statutes to provide that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Doe's claim sounding in the loss of honest services might satisfy these statutes to the extent that she alleges mail or wire fraud violations occurring after the effective date. Consequently, such allegations could serve as predicate racketeering acts, but they could not be a direct basis for civil RICO liability since § 1964(c)'s requirement of injury to property would still not be met.

into providing Roe; and (3) her cost in engaging a new lawyer. According to Doe, each of these losses represent injuries to traditionally accepted property interests—a fact which she asserts the district court erroneously failed to recognize.

Doe blurs the distinction between proprietary and personal injuries. Contrary to what Doe seems to suggest, whether she can show a financial loss does not, by definition, establish that she has suffered a business or property injury within the meaning of § 1964(c). Most personal injuries—loss of earnings, loss of consortium, loss of guidance, mental anguish, and pain and suffering, to name a few—will entail some pecuniary consequences. Perhaps the economic aspects of such injuries could, as a theoretical matter, be viewed as injuries to "business or property," but engaging in such metaphysical speculation is a task best left to philosophers, not the federal judiciary. Rather, we must determine if these injuries fall within the framework of § 1964(c) as understood by Congress, and as construed by Illinois law. They do not.

Doe's loss of earnings, her purchase of a security system and her employment of a new attorney are plainly derivatives of her emotional distress—and therefore reflect personal injuries which are not compensable under RICO. *See Rylewicz v. Beaton Services,* 698 F.Supp. 1391, 1396 (N.D.Ill. 1988), *aff'd,* 888 F.2d 1175; *Grogan,* 835 F.2d at 847. Likewise, we believe that Doe's companionship services are more properly understood as part of a personal injury claim, akin to a loss of consortium. *See Grogan,* 835 F.2d at 847. Hence, we conclude that the district court correctly determined that these asserted injuries did not warrant the protection of RICO.

Assuming again that her allegations are true, we are sympathetic to Doe's argument that permitting recovery in this case might help to deter the reprehensible conduct for which Roe is responsible. Nevertheless, we must also ask whether Doe seeks the kind of recovery that RICO was designed to redress. We can do no more than interpret the statute according to its plain language and as we believe Congress intended the language to be understood. In our view, Congress never contemplated that sexual services would be construed as property, the loss of which would be recoverable under § 1964(c). Illinois law is consistent with this interpretation. We therefore hold that the district court properly dismissed Doe's complaint because she failed to allege a business or property injury within the meaning of RICO § 1964(c).

### IV.

Accordingly, the judgment of the district court is

AFFIRMED.