**Ruth E. OSCAR; Charles Spinosa, Plaintiffs–Appellants,**

v.

**UNIVERSITY STUDENTS CO–OPERATIVE ASSOCIATION; George Proper, et al., Defendants–Appellees.**

No. 90–15750.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc Feb. 20, 1992.

Decided June 4, 1992.

Donald P. Driscoll, San Francisco, Cal., for plaintiffs-appellants.

Ephraim Margolin, Margolin, Arguimbau & Battson, San Francisco, Cal., for defendants-appellees.

Before: WALLACE, Chief Judge, and HUG, SCHROEDER, ALARCON, POOLE, D.W. NELSON, BRUNETTI, NOONAN, THOMPSON, RYMER, and KLEINFELD, Circuit Judges.

D.W. NELSON, Circuit Judge:

Plaintiffs Ruth Oscar and Charles Spinosa (collectively Oscar) rented apartments in Berkeley near Barrington Hall, a student co-operative run by defendant University Students Co–Operative Association (USCA). Angered by a wide range of unneighborly behavior on the part of Barrington residents, including drug dealing, Oscar sued USCA and all the residents of Barrington Hall. Oscar claimed that the activities of Barrington residents collectively violated the Racketeer Influenced and Corrupt Organizations Act (RICO), and sought treble damages under 18 U.S.C. § 1964(c). The district court dismissed the complaint for failure to state a claim. A three judge panel of this court reversed, *Oscar v. University Students Co-operative Ass'n*, 939 F.2d 808 (9th Cir.1991), and we agreed to rehear the case en banc. *Oscar v. University Students Co-operative Ass'n*, 952 F.2d 1566 (9th Cir.1992). We affirm the district court's dismissal of the complaint.

I.

According to the factual allegations of plaintiffs' complaint, Barrington Hall residents collectively agreed at a house meeting to allow drug dealing at Barrington. At least nineteen different individuals within the co-operative sold drugs there, and drug sales have allegedly been going on at Barrington for over twenty years. In furtherance of this agreement, according to the complaint, defendants posted lookouts on neighboring property, and dumped the bodies of persons suffering from drug overdoses on their neighbors' land. The conspiracy was also responsible, we are told, for "filth, risk of disease, and noise"; for "violence, throwing of garbage on property, urinating on cars [and] vandalism"; and for numerous other crimes, misdemeanors, nuisances, and annoyances.

The plaintiffs rent apartments in large apartment buildings near Barrington. Barrington is located in the city of Berkeley, California, which has one of the strictest rent control ordinances in the nation. The plaintiffs began renting there in the mid-1980's. Since the complaint was first filed, one of the plaintiffs has moved out; the other remains. The plaintiffs allege that they have lost the use and enjoyment of their "property"—that is, their rental interest—as a result of the activities at Barrington.

After allowing Oscar three opportunities to amend her complaint, the district court dismissed it on the grounds that Oscar could not demonstrate a causal connection between a pattern of racketeering activity and injury to Oscar. We affirm the dismissal of Oscar's complaint on the ground that Oscar has not alleged an injury to business or property cognizable under RICO.

## II.

Dismissal of a complaint under Fed. R.Civ.P. 12(b)(6) is reviewed de novo. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). In reviewing a 12(b)(6) dismissal, all allegations of material fact in the complaint are taken as true and are construed in the light most favorable to the nonmoving party. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir.1989). The decision of the district court may be affirmed on any ground finding support in the record. *Myers v. United States Parole Comm'n*, 813 F.2d 957, 959 (9th Cir.1987).

## III.

■ 18 U.S.C. § 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of" RICO may recover treble damages and attorney's fees. While RICO is to be "liberally construed," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985), it is well-established that not all injuries are compensable under this section. Two limitations are significant in this case. First, a showing of "injury" requires proof of concrete financial loss, and not mere "injury to a valuable intangible property interest." *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir.1990) (citing *First Pacific Bancorp v. Bro*, 847 F.2d 542, 547 & n. 12 (9th Cir. 1988)); *see also Fleischhauer v. Feltner*, 879 F.2d 1290, 1299–1301 (6th Cir.1989) (plaintiffs under section 1964(c) entitled to recover only for money they paid out as a result of racketeering activity), *cert. denied*, 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 and 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 611 (1990).

In *Berg*, we held that directors of the Getty Oil Company could not maintain an action under RICO against the insurers who had cancelled their liability policies because the directors had incurred no actual expenses as a result of the cancellation. 915 F.2d at 463–64. This was true even though the directors alleged that they had lost "both the protection ... afforded against potential financial loss in the future and the present peace of mind that flows from such protection," interests which we characterized as "valuable intangible property interest[s]." *Id.* at 464. The lesson of *Berg* is that injuries to property are not actionable under RICO unless they result in tangible financial loss to the plaintiff.[1]

■ Second, it is clear that personal injuries are not compensable under RICO.

---

**1.** The dissent attempts to distinguish *Berg* and the other cases establishing the financial loss requirement by suggesting that *Berg* could have reached the result it did without requiring financial loss. That is beside the point. *Berg* unambiguously held that "by 'actual injury,' we meant financial loss ..." 915 F.2d at 464. The dissent cannot point to a single case rejecting the financial loss requirement, or even a case allowing recovery for nonfinancial losses under RICO.

The dissent also makes much of the fact that *Berg* was a summary judgment case, while this case arises on a motion to dismiss. That distinction is not relevant in this case. *Berg* stated a proposition of law: injury under RICO requires proof of financial loss. We affirm the dismissal of Oscar's claim not because she failed to prove financial loss, but because she failed after four attempts to allege any facts which *could* show financial loss.

*See, e.g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) (dictum); *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 918 (3rd Cir.1991) (plaintiffs could not recover medical expenses and emotional distress resulting from their exposure to toxic waste); *Berg,* 915 F.2d at 464 (loss of security and peace of mind due to cancellation of insurance policy were not actionable under RICO); *Rylewicz v. Beaton Services,* 888 F.2d 1175, 1180 (7th Cir.1989) (harassment and intimidation of litigants in an attempt to get them to settle lawsuit could not support RICO claim); *Grogan v. Platt,* 835 F.2d 844, 846–47 (11th Cir.) (family of murder victim could not recover under RICO for economic consequences of murder), *cert. denied,* 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988); *Drake v. B.F. Goodrich Co.,* 782 F.2d 638, 644 (6th Cir. 1986) (damages for physical injury and wrongful death resulting from exposure to toxic waste were not recoverable under RICO).

■ These limitations are consistent with the intent of Congress in enacting RICO. As the *Genty* court explained:

> Congress' apparent unwillingness to allow recovery for personal injuries under RICO appears to be consistent with enacting RICO and its specific intention to thwart the organized criminal invasion and acquisition of legitimate business enterprises and property. Ample law already existed to provide recovery for wrongfully inflicted personal injuries. The unavailability of a civil RICO treble damages action for personal injuries in no way restricts the plaintiff's right to bring a pendent state wrongful death or personal injury action along with a RICO action for damages to business and property. We discern no injustice in limiting a RICO plaintiff's recovery for his personal injuries to ordinary non-RICO legal measures.

We thus refuse to enlarge Congress' specific limitation of RICO recovery to business and property. The significance of section 1964(c)'s plain language is clear: RICO plaintiffs may recover damages for harm to business and property only, not physical and emotional injuries due to harmful exposure to toxic waste. 937 F.2d at 918–19. We agree. RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff. Requiring that a plaintiff demonstrate a financial loss to her business or property is consistent with that purpose. It is also consistent with what the Supreme Court has termed the "restrictive significance" of the phrase "injured in his business or property." *Reiter,* 442 U.S. at 339, 99 S.Ct. at 2331. With these limitations on compensable injury in mind, we turn to the allegations of Oscar's complaint.

## IV.

■ Oscar has not alleged any financial loss which would be compensable under RICO. She has not alleged any out-of-pocket expenditures as a direct or indirect result of the racketeering activity at Barrington, for example costs incurred to repair damage to her personal property or even to purchase a security system. The only injury she has alleged is a "decrease in the value of her property" due to the racketeering activity next door. We do not believe that such a decrease entails financial loss to Oscar.[2]

Oscar rents an apartment in the city of Berkeley. She does not own the property on which she lives; her property interest in the land is a leasehold interest.[3] Although one might measure an owner's loss by the diminution in fair market value, the same

---

**2.** In reaching this conclusion, we deal only with the issue of financial injury, not proximate cause. We do not consider what, if any, types of claims by neighboring property owners might survive the proximate causation requirements of RICO. *See Holmes v. Securities Investor Protection Corp.,* — U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

**3.** We are somewhat puzzled by the dissent's extended discussion of Oscar's property rights. We nowhere suggest that Oscar does not have a property interest in her apartment. We merely conclude that she has not shown "injury" to that property within the meaning of section 1964(c).

cannot be said for a renter. If the resale value of the property goes down, Oscar has lost nothing. Indeed, if the value of the property drops far enough, Oscar's rent should go down. She would incur a financial *gain,* not a loss.

As a renter, Oscar could suffer financial loss in this situation only if she had an interest she could sublet and the racketeering enterprise reduced the rent she could charge to sublet her apartment. Before this court, Oscar claims to have suffered just such an injury. We reject this argument for several reasons. First, Oscar's complaint does not even allege that she has a right to sublet her apartment. Second, even if Oscar has the right to do so, she has not alleged that she ever sublet the apartment, that she ever attempted to sublet the apartment, or even that she ever wished or intended to sublet the apartment. Any supposed loss is therefore purely speculative. Finally, the Berkeley rent control law prevents Oscar from charging a sublessor rent in excess of the rent-controlled price of the apartment. To show injury, therefore, Oscar would have to allege that the racketeering activity caused the market value of her apartment to decline below the (artificially low) rent control price, and that she could not simply move out if that happened.

Oscar has had four chances to make such allegations. She has not done so. To remand her complaint for trial on the off chance that she could make such a showing in the future would be to allow her to rely on precisely the sort of speculative future injury which RICO disdains. *See Hecht v. Commerce Clearing House,* 897 F.2d 21, 24 (2nd Cir.1990).

■ Oscar also claims that she has lost the "use and enjoyment" of her leasehold interest; she values her apartment less than she otherwise would because there are drug dealers living next door.[4] No doubt this is true. This diminution in enjoyment is not a tangible injury to property, however. Whether or not Oscar herself enjoys her apartment less, the bottom line is that the *market* value of Oscar's leasehold interest has not declined.

■ What Oscar is really complaining about is the "personal discomfort and annoyance to which [she] has been subjected by a nuisance on adjoining property." *Ingram v. City of Gridley,* 100 Cal.App.2d 815, 224 P.2d 798, 803 (1950). We agree with the dissent—this is a perfectly cognizable claim for nuisance under California law. The *injury* alleged, however, "is like that claimed by the plaintiff in a personal injury action." *Id.* As we have seen, personal injuries are not actionable under RICO. Oscar has no doubt lost "peace of mind" as a result of the activities at Barrington. *Berg,* 915 F.2d at 464. As we held in *Berg,* however, such a loss—even when it flows from a valuable property interest—is "a personal injury in the form of emotional distress, not a claim for an injury to property as section 1964(c) requires." 915 F.2d at 464.[5]

We do not intend to denigrate the severity of the problems Oscar has alleged or the harm inflicted on her. It is clear, however, that any injury she has suffered is at core an intangible personal injury, not a financial loss to property. Oscar can recover for such injuries under any one of a myriad of state law causes of action. She cannot do so under RICO, however.

---

**4.** Oscar has "lost" the use and enjoyment of her property only in a very technical sense. She first moved into her apartment in the mid-1980's; according to her own allegations, Barrington was conducting drug deals in the neighborhood long before then. Oscar thus has not *lost* anything; what she really means is that she *has never had* as much use and enjoyment of her property as she believes she is entitled to. This is yet another step removed from financial loss.

**5.** If Oscar's Maserati was smashed, or her house was burned down, she is injured in a variety of ways. However, if her insurance pays the full cost of replacing these items, she has suffered no *financial* loss. Oscar might be attached to her Maserati, and she almost certainly would not be indifferent to her house burning down, even though she could buy a new one. This intangible or sentimental value is compensable in a tort action, just as emotional distress is compensable. Neither is compensable under RICO, however.

As the Seventh Circuit said recently in rejecting a RICO claim for economic losses which derived from a fundamentally personal injury: "Perhaps the economic aspects of such injuries could, as a theoretical matter, be viewed as injuries to 'business or property,' but engaging in such metaphysical speculation is a task best left to philosophers, not the federal judiciary." *Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992). The requirements for pleading an injury cognizable under RICO are quite clear. They are not met here.

AFFIRMED.

KLEINFELD, Circuit Judge, with whom Circuit Judges HUG and BRUNETTI join, dissenting:

I respectfully dissent.

Congress and the President have promulgated a statute which enables people of moderate means to retain attorneys with the aid of a fee shifting provision, and recover treble damages, by suing narcotics dealers who reduce the quality of life in their neighborhood. This bounty, taken from the property of narcotics dealers, offers a benefit to induce citizens to act as private attorneys general, and offsets the burdens which might deter them from relying entirely upon the criminal justice system. Our narrow and novel construction of RICO damages vitiates the statutory scheme in an important application.

The panel's decision, *Oscar v. University Students Co-operative Association*, 939 F.2d 808 (9th Cir.1991), is correct, and its correctness is strengthened by the subsequent Supreme Court decision in *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Elucidation of the traditional concepts of property, injury to property, and damages, and application of those concepts to the kind of harms claimed in this case, requires that the lawsuit be permitted to proceed. Damages of the kind claimed by Oscar and Spinosa traditionally do not require tangible financial loss, though in some other RICO applications financial loss must be proved. The statute, interpreted according to the well established common

law meanings of its terms, empowers people to hire attorneys at the expense of neighboring drug dealers whose narcotics dealing ruins the quality of life for nearby apartment dwellers and homeowners, and take away the criminals' money. The rescue of neighborhoods, by allying law abiding citizens' financial self-interest with their altruism, through the mechanism of treble damages lawsuits against racketeers, appears to have been just what Congress intended. *Sedima v. Imrex Co.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985), taught us that "[t]here is no room in the statutory language for an additional, amorphous 'racketeering injury' requirement." Likewise, there is no room for an additional tangible financial loss requirement. Congress has not authorized us to erect this door and shut it on a kind of case most central to achieving the purposes of the statute.

Title 18 U.S.C. § 1964(c) provides that [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

The statute does not say "injured in his ... property with consequential financial loss." It just says "injured in his ... property." Damages are required, but damages for injury to property are generally measured other than by realized financial loss. *Sedima* sets forth the elements of a RICO claim. The majority opinion incorrectly attributes a novel and narrow meaning to "injured" and "damages." In the case at bar, if the complaint is true, then Oscar and Spinosa were probably paying the same amount of rent money as they would have without the drug dealing, but the pattern of narcotics dealing reduced the value of their apartments, so they suffered damages measured by the reduction in value.

### I. Facts

It is important that this appeal involves a dismissal under Rule 12(b)(6) rather than

an adverse decision on summary judgment or at trial. We are required to assume the truth of the averments in the complaint for purposes of determining whether they state a claim upon which relief can be granted. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). A dismissal for failure to state a claim is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). There is as yet no evidence before the court upon which any evaluation could be made of the truth of the alleged facts.

We must therefore assume that USCA intentionally aided, abetted and conspired in the sale of LSD, methamphetamine and heroin at Barrington Hall. We must assume that Oscar and Spinosa rented apartments in an adjacent building and that Oscar rented off-street parking. Unless it is beyond doubt that plaintiffs could prove no facts in support of this proposition, we must assume that, as the complaint avers, the racketeering activity "negatively affected the value of the plaintiffs' property interest in their apartments." The drug dealing, we must assume, generated fear in people entering Oscar's and Spinosa's building, caused risk of disease from discarded hypodermic needles, and caused filth, urination on tenants' cars, noise, and deposits of garbage, feces, vomit and the deposition of bodies of overdosed drug users on the common parts and parking areas of the building where Oscar and Spinosa lived. Assuming that these things are true, we must decide whether this claim is one upon which relief could be granted under RICO.

## II. *Berg* and Other Authorities Cited

The majority opinion states two premises for its conclusion:

First, a showing of "injury" requires proof of concrete financial loss, and not mere "injury to a valuable intangible property interest." ... The lesson of *Berg* is that injuries to property are not actionable under RICO unless they result in tangible financial loss to the plaintiff.

Second, it is clear that personal injuries are not compensable under RICO. Maj. op. at 785–86 (citations omitted). The second premise is plainly correct, but does not lead to the conclusion reached by the majority, because the injury claimed is of a kind that the law has always considered injury to property, not injury to the person. The first premise is novel and unsupported by the authorities. Whether injury to a tenant's property interest in real estate without tangible pecuniary loss confers RICO standing appears to be a question of first impression. The authorities relied upon by the majority do not resolve the issue, and their reasoning cuts in favor of the plaintiffs.

*Berg v. First State Ins.,* 915 F.2d 460 (9th Cir.1990), was a summary judgment case, not a Rule 12(b)(6) case. That matters, because the RICO claim in *Berg* had to be tested against evidence, not just allegations. The plaintiffs brought a RICO suit against their insurance companies for wrongful cancellation of their liability insurance policies. They suffered no monetary loss, because the insurance companies defended them despite the cancellation, and the lawsuits against them were settled in a way which cost them no money. We accepted the proposition that insurance policies are property, but we found no damages, because the directors had suffered no financial loss. We also determined that the interference with the directors' peace of mind while the lawsuit was pending was personal injury, not injury to property.

*Berg* is distinguishable, because the nature of the property was a contract right. The only damages from injury to that property would be on account of loss of performance of the contract. The directors were put in as good a position by the defense and settlement as they would have been by performance, so no damages of the type awarded for injury to contract rights could be proved.

Had the insurance policy been valuable as tangible property, say a handsome, ancient leather-bound parchment from

790

Lloyd's with a wax and ribbon seal, and not just as a contract right, then injury to the property would have been more analogous to Oscar's and Spinosa's claimed injuries. The analogy would exist because the damages for injury to property are generally the reduction in value of the property. Contract damages like those at issue in *Berg* are generally designed to put the victim in as good a position as he would have enjoyed had the contract been performed. For tortious injury to an interest in land, the usual measure of damages is the reduction in value caused by the harm, loss of use, and discomfort and annoyance to the occupant. Restatement (Second) of Torts § 929(1) (1977). The proposition that injury to property requires financial loss is one thing where the property, as in *Berg,* is in the nature of a promise to protect the owner against financial loss, and quite another where the property is real estate damaged by a tort.

*Berg* stands only for the propositions that damages are an element of a RICO claim, and that the damages must be for injury to property. In the summary judgment context of that case, plaintiffs needed some cognizable evidence of damages resulting from the injury to their property rights in the insurance policies and did not have it. Only evidence of tangible financial loss would have sufficed in *Berg* because that was the only kind of cognizable damages which would have been possible for injury to the kind of property at stake.

*First Pacific Bancorp v. Bro,* 847 F.2d 542 (9th Cir.1988), also involved summary judgment rather than a motion to dismiss. We affirmed because "[a]bsent damages, the RICO claim can not be sustained," and the bank had "failed to make a showing of actual injury" and had "provided no evidence to support the inference that financial loss or injury was incurred as a result of the proxy solicitations or the proposed shareholder derivative suit." *Id.* at 547 & n. 12. The bank had claimed that a threatened proxy fight had caused deposits and loans to fall off, but presented no evidence to prove it. We specifically noted that the defendants had not obtained any money or property and no corporate action had re-sulted from the threatened proxy fight. *Id.* at 544. *Bro* does not apply a financial loss requirement to screen out a claim where there is injury to an interest in real estate in the nature of reduction of value. Nor does it create a financial loss requirement. *Bro* just notes the absence of financial loss in a context where financial loss would be the only kind of damages possible.

*Fleischauer v. Feltner,* 879 F.2d 1290 (6th Cir.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 *and* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 611 (1990), went to trial, so the court was not deciding what kinds of damages could be pleaded, but rather what kinds had been proved. *Fleischauer* denied expectancy damages, "[a]lthough in some cases expectancy damages might be appropriate," *id.* at 1300, because the proof did not support them in that case.

The majority opinion cites a number of other authorities for the correct proposition that personal injuries are not compensable under RICO, but I can find no case from any circuit standing for the proposition that realized tangible financial loss must be pleaded. Tangible financial loss must be proved where, if the plaintiff had any damages from the injury to plaintiff's property or business, the damages would be tangible financial loss. Where the category of harm is injury to the person, tangible financial loss cannot confer RICO standing; the explanations given for this proposition imply that where the category of harm is injury to property of a type measured by reduction of value, absence of tangible financial loss cannot take away RICO standing.

The majority concedes that the plaintiffs' interests in their apartments constitute property interests. Maj. op. at 786 n. 3. This means that injury to those interests is injury to property. The majority concludes that although plaintiffs' interests are property, they have not pleaded injury. *Id.* The majority concedes that Oscar has pleaded a claim for nuisance. The step at which the majority and I take different paths is the next one. Under the majority view, because Oscar and Spinosa did not

plead tangible financial loss, they have no damages. Under my view, loss of value will suffice as damages for nuisance, without tangible financial loss. We disagree on whether, under RICO, the resemblance of the reasons for reduction of the value of land afflicted by nuisance to emotional distress in personal injury, converts nuisance from a claim for injury to property to a claim for injury to persons. I cannot accept the proposition that a loss of the benefits of property ownership, even if "it flows from a valuable property interest," maj. op. at 787–88, is a personal injury claim in the absence of a market exchange producing financial loss. None of the cited cases speak to that point.

*Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) does not speak at all to this. Nor does *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918 (3d Cir.1991). *Genty* was a RICO claim by home buyers against developers who fraudulently concealed a toxic dump which reduced the value of their home. The Third Circuit held that the reduction in value of the house was compensable under RICO, but that personal injuries, including medical expenses and mental distress caused by fear of cancer, were not. In the case at bar, plaintiffs alleged a "decrease in the value of their property caused by defendant's racketeering," so *Genty* supports them. Decrease in the value of their leasehold interest, whatever it may turn out to be, is injury to property, like the decrease in the value of the house in *Genty*.

*Rylewicz v. Beaton Services, Ltd.*, 888 F.2d 1175, 1180 (7th Cir.1989), stands for the propositions, not at issue here, that RICO recovery is not available for personal injuries or for a shareholder's derivative claim. In *Grogan v. Platt*, 835 F.2d 844, 846–47 (11th Cir.), *cert. denied*, 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988), the victim of the RICO conduct was murdered; murder is personal injury, not injury to property, and pecuniary losses flowing from the wrongful death could not transform personal injury into injury to property. Just as the presence of pecuniary losses cannot make personal injury compensable under RICO in *Grogan*, I suggest that absence of realized pecuniary losses cannot eliminate the compensability under RICO of property injury flowing from racketeering activities, provided that there are damages. The issue is always whether there are damages from injury to property; whether there is realized pecuniary loss matters only where that is the appropriate measure of damages. Similarly, *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir.1986), was purely a personal injury claim, for sickness and death allegedly arising out of exposure to toxic chemicals at the workplace. As in *Grogan*, the existence of consequential pecuniary harm could not save the RICO claim, because it was for personal injury, not injury to property.

In the case at bar, as in *Berg* and *Bro*, plaintiffs may fail to develop cognizable evidence of damages in opposition to a summary judgment motion, or persuasive evidence of damages at trial. If they fail to produce the necessary evidence of damages from injury to property, their RICO claim would properly be dismissed because of the failure of proof. But at the present juncture, we are required to proceed on the supposition that plaintiffs could develop evidence of the damages, because they aver damages in their complaint.

### III. Injury to Property

Oscar and Spinosa must allege injury to property and damages, because these are two elements of their RICO claim. The kind of injury to property alleged by the plaintiffs controls what kind of damages are material to their claim.

#### A. *Commercial Loss Unnecessary*

USCA argues that only losses of a commercial or business nature are recoverable under section 1964(c). Though the majority opinion does not adopt that proposition, there is value in showing why it is incorrect, because the reasoning of the cases rejecting it also compels rejection of the majority's requirement of realized financial loss.

In *Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court incorporated the proximate causation element of the Clayton Act into section 1964(c). The Court observed that "Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act," and that the federal courts had construed section 4 and its predecessor, section 7 of the Sherman Act, as incorporating common law principles of proximate causation. *Id.* 112 S.Ct. at 1317. The *ratio decidendi* underlying the *Holmes* decision was that

> the 91st Congress, which enacted RICO, [knew] the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

*Id.* 112 S.Ct. at 1317–18 (citations omitted). Although *Holmes* involved the issue of proximate causation rather than injury to property, the reasoning employed by the Court compels us to use Clayton Act and Sherman Act cases to construe the words "injured in his ... property."

The leading Clayton Act case on injury to property is *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The Court firmly rejected the possibility of any *noscitur a sociis* gloss on "property" within the meaning of the Clayton Act's section 4. *Reiter* teaches that anything of material value owned or possessed is "property," even though it is of no commercial significance:

> [T]he word "property" has a naturally broad and inclusive meaning. In its dictionary definitions and in common usage "property" comprehends anything of material value owned or possessed.

*Id.* at 338, 99 S.Ct. at 2330. The Court rejected the contention that the adjacent reference to "business" modified the meaning of the term "property," stating that Congress' use of the disjunctive "or" indicated that the terms were to be given separate meanings. Thus, while the Court noted that personal injury would not fall within the purview of the statute, *id.* at 339, 99 S.Ct. at 2331, the term "property" was given an unmistakably broad meaning.

After *Holmes* and *Reiter,* it cannot be disputed that injury to a noncommercial possessory interest in real estate is injury to property. The majority correctly concedes that Oscar and Spinosa's interests in their apartments, even if month-to-month and without a written long-term lease, are "property." *See also Jones v. Kelly,* 208 Cal. 251, 280 P. 942, 943 (1929); *Stoiber v. Honeychuck,* 101 Cal.App.3d 903, 162 Cal. Rptr. 194, 201–02 (1980).

### B. *The Alleged Harm is Injury to Property*

The majority reads into the phrase "injured in his ... property" a qualification that if the consequence of the injury to the property is personal discomfort and annoyance without tangible financial loss, the injury must be categorized as personal injury rather than injury to property. That construction cannot withstand established Clayton Act and Sherman Act authority.

We must look to the common law categories of injury to person and injury to property in order to determine which claims are for injury to property under RICO. *Holmes* establishes that the words and concepts are transitive between the Clayton Act, the Sherman Act, and section 1964(c) of RICO, so we must look to the Sherman Act and Clayton Act authorities. It is well established that "Congress intended the [Sherman] Act to be construed in the light of its common-law background." *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 531, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (holding that proximate causation in the common law sense was required under section 4 of the Clayton Act). *Holmes* delineated the parameters of the proximate causation element of section 1964(c) by reference to "the many shapes this concept took at common law." *Holmes,* 112 S.Ct. at 1318. The words copied into RICO from the Sherman Act and Clayton Act incorpo-

rate the ancient concepts lawyers have developed over the centuries in the common law. We must look to common law principles in determining whether the kinds of injuries claimed by Oscar and Spinosa are categorized as injury to property or injury to person, in order to determine whether they were injured in their property within the meaning of section 1964(c).

The harm alleged by plaintiffs was to the value of their interests in their apartments. The creation of a tenancy in residential property does not merely establish a contractual relationship between the landlord and the tenant. A tenancy, whether periodic or for a definite term, conveys to the tenant a possessory interest in the property which is characterized as an estate in land. *Jones v. Kelly*, 208 Cal. 251, 280 P. 942, 943 (1929); Restatement of Property §§ 19–20 (1936). Although a leasehold is founded in an agreement between landlord and tenant, it is not merely a contract right, as in *Berg*, but also "an estate in land in the strictest sense." Roger A. Cunningham, et al., *The Law of Property* §§ 6.11, 6.13 (1984). The tenant has a right to sue directly third persons who trespass on the tenant's possession "or whose conduct constitutes a nuisance, decreasing the lessee's enjoyment of his term." Richard R. Powell & Patrick J. Rohan, *Powell on Real Property* § 225(4) (1968); *Stoiber v. Honeychuck*, 101 Cal.App.3d 903, 162 Cal.Rptr. 194, 201–02 (1980).

The connection between the tort of nuisance and the enjoyment and peace of mind of the possessor of land does not make plaintiffs' claim one for personal injury, as the majority opinion suggests. The word "enjoyment" is just the ancient common law term of art describing one of the tenant's property rights inhering in the nature of his estate. "The essence of a private nuisance is an interference with the use and enjoyment of land." W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 87, at 619 (5th ed. 1984). Though the description of the interest harmed as "use and enjoyment" might seem to imply that disturbance of the interest would be an injury to the person, "the law as to leases is not a matter of logic *in vacuo;* it

is a matter of history that has not forgotten Lord Coke." *Gardiner v. William S. Butler & Co.*, 245 U.S. 603, 605, 38 S.Ct. 214, 62 L.Ed. 505 (1918) (Holmes, J.). "The ownership or rightful possession of land necessarily involves the right not only to the unimpaired condition of the property itself, but also to some reasonable comfort and convenience in its occupation." Keeton, *supra,* § 87, at 619.

We are seven centuries too late to characterize nuisance as injury to person rather than to property. The complaint alleges facts sufficient to support a claim that the defendant's racketeering activity interfered with the plaintiffs' right to the use and enjoyment of their apartments. At common law, an allegation that the defendant has invaded the plaintiff's interest in the use and enjoyment of property sounds in tort and states a claim for nuisance. This tort arose in the thirteenth century to vindicate "interferences with servitudes or other rights to the free use of land." Keeton, *supra,* § 86, at 617. Blackstone described nuisance as a injury to property, and so it has always been: "A third species of real injuries to a man's lands and tenements is by nuisance." J.W. Ehrlich, *Ehrlich's Blackstone* 581 (1959). Blackstone says the ancient writ for damages for nuisance was available to lessees as well as to holders of the fee. *Id.* at 584. Since this right is "inseparable from ownership of the property," conduct that interferes with the "right to the undisturbed enjoyment of the premises" constitutes injury to property within the meaning of section 1964(c). Keeton, *supra,* § 87, at 619.

The classification of nuisance as injury to real estate is not a mere historical anomaly to be filtered out of the common law on the way to RICO. Though the consequences of nuisance may be annoyance to persons rather than physical harm to land, the persons are harmed only because of their connection to the land.

Thus, many interferences with personal comfort, such as a dog next door which makes night hideous with his howls, which at first glance would appear to be wrongs purely personal to the landhold-

er, are treated as nuisances because they interfere with that right to the undisturbed enjoyment of the premises which is inseparable from ownership of the property.

*Id.*

Oscar and Spinosa do not suggest that the narcotics dealers bore them any special animus, just that the drug dealing adversely affected the nearby apartments in which they had the misfortune to live. The harm would be imposed on anyone who had the connection to the real estate that they did, and it would not have been imposed on Oscar and Spinosa but for their connection to the land. The majority opinion concedes that plaintiffs state a claim for nuisance.

The majority cites *Ingram v. City of Gridley*, 100 Cal.App.2d 815, 224 P.2d 798 (1950), for the proposition that plaintiffs' claims are " 'for personal discomfort and annoyance.' " Maj. op. at 787 (quoting *Ingram*, 224 P.2d at 803). The majority infers that we must classify the claims as personal injury rather than injury to property, because the injury " 'is like that claimed by the plaintiff in a personal injury action.' " *Id.* However, *Ingram* explicitly classifies the tort of nuisance in California as "injury to real property." *Ingram*, 224 P.2d at 801. The nuisance at issue in *Ingram* was discharge of sewage into a slough flowing through the plaintiffs' dairy. The court stated that the measure of damages is "usually held to be the depreciation in the market or usable or rental value of the property, together with such special damages as may be proved." *Id.* *Ingram* says that the damages for "annoyance, discomfort, and inconvenience caused by a nuisance [and] deprivation of the comfortable enjoyment of the property," *id.* at 802, are *like* that claimed by the plaintiff in a personal injury action," *id.* at 803 (emphasis added), not that that they *are* damages for personal injury. The point of the comparison was to explain why the evidence of such intangible and nonpecuniary damages as impairment of the flavor of the milk produced and the fact that "guests ... would remain away rather than suffer the noisome stench," *id.* at 802, was suffi-

cient to prove damages, even without expert testimony or pecuniary loss.

## IV. Damages

Once the injury is classified as nuisance, which is an injury to real property, the measure of damages for that tort compels a determination that the complaint states a claim.

### A. *Financial Loss*

The majority slides off the path because of a conceptual error relating to the valuation of damages in rental property.

> Although one might measure an owner's loss by the diminution in fair market value, the same cannot be said for a renter. If the resale value of the property goes down, Oscar has lost nothing. Indeed, if the value of the property drops far enough, Oscar's rent should go down. She would incur a financial *gain*, not a loss.
>
> As a renter, Oscar could suffer financial loss in this situation only if she had an interest she could sublet and the racketeering enterprise reduced the rent she could charge to sublet her apartment.... To show injury, therefore, Oscar would have to allege that the racketeering activity caused the market value of her apartment to decline below the (artificially low) rent control price, and that she could not simply move out if that happened.

Maj. op. at 787.

The plaintiffs' property is not held, like negotiable instruments, merely for the purpose of exchange. People rent apartments in order to live in them. If the value of an interest in real or tangible personal property is reduced by a tort, then the owner of the interest, whether it is a chattel real such as the plaintiffs own, an automobile damaged in a collision, or a house burned down, has damages for injury to property, whether they exchange the damaged property for money or not. Although they might have more money left in their pockets if the value was so impaired that their rent declined, Oscar and Spinosa would

have injury to the value of their possessory rights in their apartments.

Oscar and Spinosa need not allege that they intended to sublet their premises or that they have suffered any out-of-pocket loss, because realization of tangible financial loss through a market exchange is not required to establish damages for injury to real property. The measure of damages in a California private nuisance case is "diminution of the property's value and for annoyance and discomfort flowing from loss of use." *Moylan v. Dykes*, 181 Cal.App.3d 561, 226 Cal.Rptr. 673, 680 (1986). In *Moylan*, the evidence established that during the time plaintiffs could not use their property and a planned sale fell through because of the interference, the property appreciated, so they had no tangible pecuniary loss. Yet the court held that "even if intangible, the damages are no less real," *id.*, and upheld an award apparently based on a daily fair rental value. To measure injury to property, we must look at what happened to the value of the property, not what happened to the pecuniary condition of the owner, except insofar as that may bear on the truth of what happened to the value of the property.

Taking the majority's hypothetical cases at footnote 5, suppose a person's car is wrecked, or his house burned down, but insurance pays the full cost. The majority perceives no injury to property because the owner has suffered no net financial loss. It is more accurate, in my view, to say that the property has been injured, and treat the financial consequences to the insured owner as relevant to whether an insurer might be subrogated to part of the RICO recovery. While realization of pecuniary loss is sometimes required for tax deductions, it is generally not required for recovery of damages for injury to real property.

> [An injured plaintiff] is not required to prove that he sold his damaged automobile at a loss, for example, or that it was any less useful to him after the damage. A plaintiff whose land is used by a trespasser is entitled to recover general damages, probably rental value of the land. This is true even though he would not have leased the land to anyone and is in

no way worse off because of the trespass.

Dan B. Dobbs, *Handbook on the Law of Remedies* 140 (1973). The majority's requirement of tangible financial loss as a consequence of the injury is analogous to the argument that a person is not damaged by the conversion of his umbrella because it did not rain. If what he owned was not an umbrella, but rather a promise by someone that he should remain dry, then the majority's requirement of tangible loss would be correct, and he would have no damages if it did not rain. That would be like *Berg*, where the directors owned a promise that they would be defended and would not suffer financial loss in lawsuits. But if a person owns an umbrella, the physical thing itself, then he is entitled to keep it, and he has damages from injury to his property if a tortfeasor damages or steals it. Suppose a merchant's windows are smashed by hoodlums because he refuses to pay protection money. He has damages from injury to property when the glass breaks, even though he may not have pecuniary loss until he scrapes together enough money to pay a glazier to replace it.

The majority cites *Doe v. Roe*, 958 F.2d 763 (7th Cir.1992), which holds that no RICO claim lies for fraudulent inducement of "sexual services" and consequential miscellaneous expenses. The case holds that where the financial losses are "derivatives of [the plaintiff's] emotional distress," they cannot convert a personal injury claim into a property damage claim. 958 F.2d at 770. "[W]hether she can show a financial loss does not, by definition, establish that she has suffered a business or property injury within the meaning of § 1964(c)." *Id.* This holding establishes the irrelevance of financial loss for categorizing the injury as one to person or property, not that financial loss is a required element.

### B. *Rent Control*

Although the majority professes to abjure "metaphysical speculation," I think it implicitly engages in just such speculation regarding the effect of rent control. The

majority suggests that since Oscar has not alleged either a right or a desire to sublet, and loses no money if her apartment becomes less desirable, she loses nothing. This is chock full of metaphysics. The implicit philosophical presupposition is that value exists only insofar as the market recognizes it in transactions. It does not occur to the majority to articulate this proposition, because its truth is so generally accepted that we rarely think about it. But it is true only upon the condition of a free market. Without a free market, price does not measure value, so we cannot assume that changes in value will be reflected in changes in price. If price is set by government command rather than by free exchange, then it is bad evidence of value. Value is generated by human desire, so declines as the thing at issue becomes less desirable. "Value is the effect in exchange of the relative social desire for compared objects expressed in terms of a common denominator." *International Harvester Co. v. Kentucky,* 234 U.S. 216, 222, 34 S.Ct. 853, 855, 58 L.Ed. 1284 (1914) (Holmes, J.).

Suppose an apartment, were it freely marketable, would be worth $800 per month, but the ceiling price of the unit under a regime of rent control is $440 per month. Since the landlord cannot raise the rent to reflect appreciation in the market value of the right to occupy the premises, and the price at which he can sell the underlying fee is depressed by the reduction in the stream of income which can be drawn from the apartments, typically he will skimp on maintenance to preserve net operating income. Peter Navarro, *Rent Control in Cambridge, Mass.,* The Public Interest, Winter 1985, at 83, 92. If the value of the fee is further reduced by crime in the neighborhood, then the resale value which the landlord preserves by continuing maintenance is also further reduced, so the point at which additional maintenance becomes uneconomic declines and the tenant can expect further deterioration of maintenance.

The consequences to the property of the criminal activity next door will also make it harder for the tenant to attract a roommate who might share the rent burden. The tenant's freedom will be circumscribed if she cannot attract friends over for dinner (as in *Ingram,* the stinking sewage in the slough case), or if she cannot walk to a convenience store in the evening or let her children walk to school, for fear of tripping over overdose victims or stepping on needles in the common parts and parking spaces.

No sensible person would value an apartment as highly if maintenance of the common parts deteriorated, roommates were hard to attract, friends were scared to come over, and the residents were scared to live their lives freely. An apartment for which $800 would have been exchanged on a free market were it not for the narcotics activity next door, and which was obtained under rent control for $440, might now have a free market value of only $500 because of the continuing criminal activity next door. The tenant owns a property right which would be worth $800 a month without the next door neighbor's narcotics dealership, but only $500 a month so long as the nuisance continues, which she is legally entitled to possess for $440. She has suffered damages, because of injury to her estate, of $300 per month. Her leasehold previously was worth $360 more per month than she was paying for it, just as many of us own houses bought before inflation which are worth much more than the monthly mortgage payments we make. Now it is worth only $60 per month more than she pays for it, because of the racketeering.

Appraisers frequently testify in condemnation and other cases to reduction in value, as distinguished from price. They call value "economic rent." This figure may be based on comparisons of comparables, replacement cost minus depreciation, and capitalization of income. They distinguish "contract rent," provided for in a lease, which is what the tenant must pay to obtain the value, and which may be higher or lower than "economic rent." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 310–15 (6th ed. 1973). The difference between contract

rent and economic rent measures the value of the leasehold. *Id.* at 464. The higher the contract rent relative to the economic rent, the more the landlord's reversion is worth. The higher the economic rent relative to the contract rent, the more the tenant's leasehold is worth. *Id.* at 448. Tenancy in a rent controlled apartment has some of the economic characteristics of a long-term lease entered into before a general increase in the price of apartments; part of the value of the reversion is transferred by the rent control law from the landlord to the tenant. *Cf. Yee v. City of Escondido,* —— U.S. ——, 112 S.Ct. 1522, 1529, 118 L.Ed.2d 153 (1992). The tenant gets a bargain price, and pays less than the apartment is worth.

Appraisers typically determine the value of real estate by locating comparable real estate, adjusting for quality differences, converting prices of the comparables to square foot values, then multiplying this figure by the square footage of the property at issue. *Id.* at 321–22. Using this method, a value, whether for purchase or rental, is found, entirely without reference to the sale or rental price. The value determined tells the interested person, typically a lender, whether the price is high or low relative to value. A bank, for example, may be willing to lend 75% of value, but not 75% of an excessively high price. Thus economic rent and contract rent are independent of each other. *Id.* at 388. The price Oscar and Spinosa pay would not even go into the appraiser's equation. Therefore, injury to the value of the tenant's interest exists independently of what the tenant pays as rent. To find injury to rental value on account of the nuisance, the difference in rental value with and without the racketeering would have to be multiplied by some number of months, but regardless of what might turn out to be the facts regarding future months, both Oscar and Spinosa have pleaded a finite elapsed time which would supply a multiplier.

The amount of crime in the neighborhood is one of the factors which appraisers consider in determining value. *Id.* at 91. Nor is there anything new in considering the effect of crime on the value of real estate.

A few decades [after Adam Smith published The Wealth of Nations, in 1776] Patrick Colquhoun reported that agricultural lands near London were worth less than those farther out. That is exactly the opposite of what one would expect because produce from more distant farms had to bear higher transportation costs when it was brought to the city market. His explanation was that the closer a farm was to London, the more of its crop was stolen! Nowadays it is standard procedure to measure the cost of crime to an area by its effect on property values.

George J. Stigler, *Memoirs of an Unregulated Economist* 194 (1988). The possessory interests of tenants as well as the reversionary interests owned by landlords are worth less, under traditional appraisal methods, regardless of whether they pay less, if drug dealing directly affects the property.

The majority is troubled because the tenant cannot sell her rights, so these values and the changes in value cannot be realized in money. But market value "is a standard, not a shackle." Charles T. McCormick, *McCormick on the Law of Damages* § 45, at 170 (1935). The law traditionally recognizes and awards damages, considered purely as property damages, even where the amounts cannot be realized on a market, where for one reason or another the market is not a fair measure of "value to the owner." *Id.* at 171. A common example of a damages award measuring loss of value to property, and treating the amount as damage to property, even though it can never be realized on a market, occurs when personalty for which there is no suitable market is destroyed. The classic example is destruction of clothes in a fire. Though there is a market for used clothing, the price in that market is not a fair measure of the loss, because most people value used clothes of which they have themselves had the exclusive use much more than they value used clothes worn by strangers. The measure of damages is cost less depreciation, not the price of comparable used clothes in used clothing

stores. Dobbs, *supra,* § 5.12, at 390 n. 4, 396 n. 39 ("real value to the owner and not their market value."). There is no market which can assign a dollar amount to this loss, and it can never be realized, because if a person sells his or her own used clothes, the buyer cannot buy the largest element of value, that of having been the exclusive wearer. Yet the law treats this increment as a proper portion of the damages for injury to property, despite its unrealizability on any market.

Rent control may complicate the appraisal process. The appraiser may have to go farther afield for comparables, outside the area where rents are depressed by controls, and outside the uncontrolled area where rents are increased by immobility of tenants benefitting from rent controls. Navarro, *supra,* at 93. Possibly the appraiser will use pre-control rents, and adjust them according to general fluctuations in real estate rentals in the region, or else will use an empirically based formula applied to replacement cost less depreciation. Expert witnesses customarily make these kinds of judgments and seek to persuade the trier of fact that their judgments are well founded, and we need not anticipate the methodology. What is important to us is that under the customary methods used by experts to value injury to property, no tangible pecuniary loss to the tenants will be needed, and rent control will have no effect except to increase the amount of the loss.

### C. *Preexistence of the Racketeering*

In a footnote, the majority correctly points out that Oscar may not have lost any value, compared to when she moved in, because the alleged drug dealership was operating when she moved in. This would matter only if Congress meant to grandfather in existing racketeering enterprises, a most unlikely proposition. The authorities are divided on the complex questions of apportionment of damages for nuisance between the tenant and the landlord, and on recovery when the tenant comes to an existing nuisance, where the damages are limited to compensation and the nuisance is a lawful activity. *Bly v. Edison Electric Illuminating Co.,* 172 N.Y. 1, 64 N.E. 745 (1902) allows recovery to the tenant who comes to the nuisance, because the alternative "would soon make a person who erects a nuisance the master of all owners or lessees who surround him." *Id.* at 15, 64 N.E. 745. The California Supreme Court, in *Vowinckel v. N. Clark & Sons,* 216 Cal. 156, 13 P.2d 733, 737 (1932), rejected the proposition that the plaintiff who comes to the nuisance cannot recover. *See also* Keeton, *supra,* § 88B, at 635. Where the nuisance is lawful, considerations of fairness may in some circumstances outweigh those of efficiency, when a suit by a tenant for nuisance seeks to transfer the burden of external diseconomies to their producer. McCormick, *supra,* § 128, at 517–18.

But where the nuisance is racketeering activity, a delicate concern for the economic interests of the criminals would be misplaced. RICO is not a compensatory statute federalizing nuisance law. It explicitly goes beyond the level at which damages would be compensatory, by its treble damages provision. Even if they have not been fortunate enough to have had neighborhoods previously free of drug dealerships, tenants are empowered by RICO to make money by acting as private attorneys general and suing the racketeers for treble damages. The rewards, enhancement of property values in neighborhoods liberated from criminals beyond what they were when the plaintiffs moved in, and money for the tenants and their lawyers who pursue this worthy objective, are incentives precisely within the statutory purpose.

### V. Proximate Causation

The majority expresses no view on the ground for dismissal articulated by the District Judge, proximate causation, but under a recent Supreme Court decision, affirmance on this ground would be erroneous. In *Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court held that a RICO plaintiff must show that his injury was proximately caused by the defendant's wrong. The Court looked to the Clayton and Sherman Acts and applied "common-law principles of proximate cau-

sation," *id.* 112 S.Ct. at 1317, to require "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 1318. In *Holmes,* the plaintiffs alleged that the defendants' racketeering activity caused the liquidation of two broker-dealers, who were rendered unable to meet their obligations to customers. The Court held that the injury was, too remote, because the customers were harmed only by the indirect consequence that the broker-dealers could not afford to pay their bills. *Id.* at 1319.

*Holmes* must be read together with *Sedima v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), which establishes that no "racketeering injury" requirement can be inferred from the statutory language, and nothing more is needed than a direct link between the racketeering activity and the injury to business or property. Oscar and Spinosa allege that they were directly harmed by the defendant's pattern of narcotics sales, because the activities necessarily affected immediate neighbors.

Their complaint suggests that the defendant's intentions were to facilitate drug sales, not interfere with neighboring real estate, but that does not eliminate causation. In construing the Clayton Act, the Supreme Court has held that the availability of the remedy "is not a question of the specific intent of the conspirators." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 479, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Even though the defendants in that case sought a benefit for themselves, and did not have it in mind to harm plaintiff, nevertheless "[t]he harm to McCready and her class was clearly foreseeable" and a "necessary step in effecting ends of the alleged illegal conspiracy." *Id.* It is reasonable to suppose that the defendant, if it did what plaintiffs allege, could foresee harm to plaintiffs' interests in their apartments.

Under *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), an analysis of the proximate causation requirement of the Clayton Act includes, among other factors, whether the plaintiffs are in that "class of persons whose self-interest would normally motivate them to vindicate the public interest ... [by performing] the office of a private attorney general." *Id.* at 542, 103 S.Ct. at 910–11. There are no links in the chain of causation between the narcotics sales and harms to Oscar and Spinosa except for the purchasers of narcotics. The narcotics users are unlikely to act as private attorneys general to vindicate the public interest in eliminating the dealers' activities. Oscar and Spinosa are the most directly affected parties likely to fulfill the statutory purpose. The complaint alleged sufficiently direct injury under our precedents. *In re Insurance Antitrust Litigation,* 938 F.2d 919 (9th Cir.1991), *petition for cert. filed,* 60 U.S.L.W. 3522, 3536–37 (Jan. 9–10, 13, 1992); *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139 (9th Cir. 1989) (en banc). This is not to say that all the damages claimed will turn out to have been proximately caused by the conduct. All that plaintiffs need to defeat a Rule 12(b)(6) motion is an allegation of some proximately caused damages, and they have that, with the reduced value of their apartments.

VI. Practical Consequences

My analysis rests upon the transitivity of the language employed in section 1964(c) and the Clayton and Sherman Acts, the meaning of injury to property in the Clayton Act, the classification of the tenants' interests as property, and the ancient classification of the tort of nuisance as injury to property. Is this excursion into the technicalities of common law, and exegesis of concepts of value, practical? A fair test of this formal reasoning would be to compare its result with the majority's to see which better achieves the purposes underlying RICO. If our analyses yield different answers, as they do, then determining whether the answers make any practical sense can help us to determine which solution is more likely correct.

The majority's characterization of interference with the right to use and enjoyment of property as personal injury rather

than injury to property precludes anyone likely to have an interest in bringing suit under the statute from suing owners of crack houses and other established narcotics dealerships that blight their neighborhoods.. USCA's brief says that Oscar and Spinosa are not directly affected by drug sales to which they are not parties, and "rarely if ever may a civil plaintiff bring a RICO suit based upon alleged narcotic transactions." Appellee's Brief at 15 n. 11. Under the majority's analysis, USCA's suggestion is correct. But that does not square with common sense. Under my analysis, those who operate crack houses and narcotics dealerships can expect to have their neighbors take away their money and property by means of RICO suits.

One of the primary purposes underlying the Organized Crime Control Act of 1970, of which RICO formed a part, was combatting the "trade in narcotics" that "causes whole cities virtually to be trapped in their homes by fear of" the maladies associated with drug use. *Organized Crime Control: Hearings on S. 30 and Related Proposals Before Subcomm. No. 5 of the House Comm. on the Judiciary*, 91st Cong., 2d Sess. 86–87 (1970) (statement of Senator McClellan, the sponsor of S. 30). Improving the quality of residential life in neighborhoods afflicted with narcotics commerce is a statutory purpose, so an accurate construction of the statute should serve that purpose.

It is no accident that the ancient words taken according to their well established meanings in the law do what Congress intended. The words were copied from much older statutes, and carried extensive accretions of common law meanings. Interpreted according to those meanings, the words effect the statutory purpose. Though RICO has been applied to conduct which does not fall within the ordinary English meaning of "racketeering," *Sedima v. Imrex Co.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), here we have the luxury of a case where the "racketeering" alleged is exactly what Congress intended the statute to scourge.

Many people are too poor to move away when narcotics dealers move into their neighborhood. Their lives are diminished because of the injury to their possessory rights in their dwellings, whether they own or rent. They lose liberty because of fear of crime. Often they cannot move, even into other comparably priced rental dwellings, because their financial circumstances do not enable them to advance moving expenses, and the first and last months' rent and security deposit for a new apartment. They cannot buy their way into suburbs or secured residential compounds, as more affluent people do to escape crime. They rely upon the law to protect the value of their possessory rights in their apartments. The value of this real property interest reflects the quality of life available to those who live in the apartments.

The operation of a massive drug distribution enterprise is exactly the kind of harm against which RICO, with its breadth and draconian penalties, can be useful. Applied in favor of tenants against neighboring drug dealers, RICO is a device for enabling people—including people who may be too poor to own their homes—to fight and destroy the social pathologies that deprive them of liberty and diminish the quality of their lives.