985 F.2d 573
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
In re LYONDELL PETROCHEMICAL COMPANY SECURITIES LITIGATION.
Joseph H. LEVIT; Walter Bely; Elsie Bely; the Elsie Bely
IRA; Lucy Feder; Rosalind Jacobson; Ronald
Kassover; Hedy-Ann Kassover,
Plaintiffs-Appellants,
v.
LYONDELL PETROCHEMICAL COMPANY; Bob G. Gower; Fred P.
Rullo; Dan F. Smith; Robert E. Wycoff; Atlantic Richfield
Co.; Camron Cooper; James S. Morrison; Robert M. Shea;
Joseph A. Putz; William T. Butler; Dudley C. Mecum; Paul
R. Staley; Goldman Sachs & Co.; Salomon Bros., Inc.,
Defendants-Appellees.
 No. 91-55899.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 5, 1992.
Decided Jan. 29, 1993.
 
 Appeal from the United States District Court for the Central District of California, No. CV-90-0126-KN David V. Kenyon, District Judge, Presiding.
 C.D.Cal.
 AFFIRMED.
 Before POOLE, FERNANDEZ and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Plaintiffs allege the Defendants violated sections 11 and 12 of the Securities Act of 1933 (15 U.S.C. §§ 77k and 77l) and section 10b of the Securities Exchange Act of 1934 (15 U.S.C. § 77j). Each of these statutes has a common requirement that the plaintiff allege a material misrepresentation or omission in a prospectus[1], document or oral communication that caused him to purchase the security. Because this threshold requirement is identical in all three statutes, the following discussion is applicable to §§ 11, 12 and 10b (unless otherwise indicated.)
 
 
 3
 The Plaintiffs present three legal arguments: (1) certain statements in the prospectus gave the false impression that Lyondell's past performance would continue in the future; (2) forward-looking predictions made in the prospectus and the road-show were false or misleading; and (3) Lyondell's failure to disclose information contained in internal financial projections was an omission of a material fact. The first two issues are addressed in the present Memorandum. The question of whether Lyondell had a duty to disclose internal projections is the subject of a separate published Opinion.
 
 
 4
 As a preliminary matter, we have compiled all the contested statements cited in Plaintiffs' brief in the Appendix to this Memorandum. Reference to a contested statement will be cited according to its numerical designation in the Appendix. Plaintiffs urge us to view the overall impression created by the statements rather than treat each statement in isolation. However, in In Re Apple Computer Sec. Litig., we rejected such an "overall pattern of deception" approach, opting instead to look at each particular statement individually to determine if dismissal was appropriate. 886 F.2d 1109, 1118 (9th Cir.1989), cert. denied, 496 U.S. 943 (1990). We adopted this "in seriatim" method in In re Convergent Technologies Sec. Litig., but added that statements cannot be analyzed in complete isolation. 948 F.2d 507, 512 (9th Cir.1991) (as amended on denial of rehearing and rehearing en banc) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors" (quotation omitted)). Accordingly, we view each statement individually, but in the context of the whole.
 
 DISCUSSION
 A. STANDARD OF REVIEW
 
 5
 A dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is a ruling on a question of law and as such is reviewed de novo. Oscar v. Univ. Students Co-op. Ass'n, 965 F.2d 783, 785 (9th Cir.1992) (en banc).
 
 
 6
 The court may review the contents of the complaint, Buckey v. Los Angeles, 968 F.2d 791, 794 (9th Cir.1992), items in the record of the case or matters of general public record, Emrich v. Touche Ross & Co., 846 F.2d 1190, 1198 (9th Cir.1988).
 
 
 7
 All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Oscar, 965 F.2d at 785. "While the court generally must assume factual allegations to be true, it need not assume the truth of legal conclusions cast in the form of factual allegations." United States ex rel. Chunie v. Ringrose, 788 F.2d 638, 643 n. 2 (9th Cir.), cert. denied, 479 U.S. 1009 (1986).
 
 B. HISTORICAL STATEMENTS
 
 8
 Statements 1, 2, 3A, 3C, 4A, 5, and 11 pertain to Lyondell's past historical performances regarding olefins margins[2], plant shutdowns[3], the ethylene market[4], and operating revenues[5]. Inasmuch as Plaintiffs do not contest the accuracy of these statements, the question is whether they give a false impression that steadily rising indicators would continue.
 
 
 9
 In Convergent, this court considered whether truthful reporting of past performance misled the market because it implied growth would continue at a "torrid pace". Id. at 513. The court held that "[t]he challenged statements [did] not imply any comparison between the rate of past and future growth. They simply report[ed] past performance and assert[ed] specific limited predictions for the future." Id.
 
 
 10
 None of Lyondell's historical statements implies a comparison between the rate of past and future growth. We therefore find these statements are not misleading.
 
 C. FORWARD-LOOKING STATEMENTS
 
 11
 Lyondell made a number of forward-looking statements in its prospectus[6] and in post-offering reports, road-shows and press reports.[7] Plaintiffs allege that certain forward-looking predictions made in the prospectus, post-offering literature and oral presentations were untrue statements of material fact as proscribed by §§ 11, 12 and 10b.[8]
 
 
 12
 We can dispose of the claim concerning statements 8 and 9 on procedural grounds. These statements were challenged only in connection with Plaintiffs' § 11 complaint. (Excerpts of Record ("ER") 3:67-68.) Because statements 8 and 9 were made during the road-show, and § 11 is limited to consideration of misrepresentations in the prospectus, they cannot be considered in this appeal.
 
 
 13
 In order to prevail with regard to the remaining seven forward-looking statements, Plaintiffs must show first that they are untrue and, if they are, that they are untrue "facts" as contemplated by the SEC.
 
 1. Untrue Statements
 
 14
 Five of the remaining seven statements cannot pass the first hurdle because Plaintiffs fail to allege they are untrue. Nothing in the Amended Complaint refutes Lyondell's predictions about 1989 olefins sales volumes[9], production capacity of the industry in general[10], expansion benefits[11], increased ethylene capacity, increased production capacity for propylene and olefins by-products[12], or the olefins business in general[13].
 
 
 15
 While the Amended Complaint refers to net income in a variety of contexts[14], it never specifically alleges that Lyondell's net income for the fourth quarter of 1988 did not approximate the third quarter of 1988, as the prospectus predicted in statement 3D.
 
 
 16
 In addition, the Amended Complaint does not contradict Lyondell's prediction in statement 4B that "olefins margins will remain well above the levels of the early 1980s for at least the next two years...." The only reference in the Amended Complaint to actual olefins margins pertains to "their steep decline by the first quarter of 1989" (ER 3:61 p 59(i)), with no mention of the levels existing in the early 1980s.
 
 
 17
 Lyondell's prediction in statement 13 that "sales volumes in 1989 are expected to be about equal with 1988" was also unrefuted. The Amended Complaint only discusses lower sales volumes in three quarters of fiscal 1989, not the entire year.[15]
 
 
 18
 Only two predictions are alleged to be untrue in the Amended Complaint: one post-offering statement pertaining to sales volumes[16], and another pertaining to the capacity of competitors.[17] In a Rule 12(b)(6) motion to dismiss, we presume facts alleged in the complaint to be true. Emrich, 846 F.2d at 1198. Therefore, we presume that these predictions (i.e., statements 10 and 12) were false. Our inquiry does not end here, however. The Securities Acts only proscribe untrue statements of "fact". Therefore, we must now determine whether an untrue "prediction" can be an untrue "fact" for the purposes proving a Securities Act violation.[18]
 
 
 19
 2. Untrue "facts"
 
 
 20
 This court has recognized that a forecast or prediction may be regarded as a "fact" within the meaning of security laws if any one of the following three conditions is met: (1) the speaker did not genuinely believe the statement was true; (2) there was no reasonable basis for the speaker to believe the statement was true; or (3) the speaker was aware of an undisclosed fact tending to seriously undermine the accuracy of the statement. In re Apple, 886 F.2d at 1113; Marx v. Computer Sciences Corp., 507 F.2d 485, 489-90 (9th Cir.1974) ("the determination of untruthfulness vel non of a [prediction] is inextricably linked with the so-called 'scienter' requirement of a private 10b-5 action and involves an inquiry into the circumstances underlying the statement to ascertain whether or not the maker was guilty of some fault or otherwise culpable"). The fact that the prediction proves to be wrong in hindsight does not make the statement untrue when made. Marx, 507 F.2d at 489-90.
 
 
 21
 Thus, we must now consider whether the Amended Complaint alleges that any of the In re Apple conditions existed when Lyondell officials made statements 10 and 12. We only consider these statements for purposes of the § 10b action. Section 11 statutorily precludes consideration of statements not contained in the prospectus. And Plaintiffs fail to plead that post-offering statements violate § 12 because that claim is brought in Count II which incorporates pp 33-59, the sections pertaining to statements in the prospectus, not pp 65-66, the sections pertaining to post-offering statements.
 
 
 22
 a. Statement 10
 
 
 23
 This post-offering statement, attributed in the Business Wire to Lyondell's CEO Defendant Dr. Bob G. Gower, contains the following forward-looking sales volumes projections: "In spite of the turnarounds and expansion work, we expect our sales volumes in 1989 to be essentially the same as in 1988."
 
 
 24
 To meet the first In re Apple condition, Plaintiffs must have pleaded that Dr. Gower did not genuinely believe the statement he made. The only allegation in the Amended Complaint regarding his belief was the conclusory charge that all the defendants "had actual knowledge of the materially false and misleading statements set forth herein...." (ER 3:86-88 pp 94, 95, 98.) Plaintiffs' allegation that the Defendants knew of the statements is far short of saying that Defendants knew facts which rendered the statements false.
 
 
 25
 Plaintiffs protest that the defendants knew their statements were false because they were made with adverse projections in hand. However, without showing that the internal predictions were inherently trustworthy (e.g., based on actual facts known to Lyondell), the mere possession of internal predictions does not prove that Dr. Gower knew that his public prediction was false. By the Plaintiffs' reasoning, he might just as well have "known" the internal predictions were false since he had the public predictions "in hand".
 
 
 26
 Plaintiffs also failed to plead that there was no reasonable basis for Dr. Gower to believe his prediction was true, as required by the second In re Apple condition. The complaint alleges no facts relating to the actual conditions in the industry or Dr. Gower's knowledge of such conditions.
 
 
 27
 And, finally, the Plaintiffs failed to allege that Dr. Gower was aware of any negative undisclosed facts that undermined the accuracy of his prediction. We are not persuaded by Plaintiffs' contention that this condition is met because defendants were aware of the undisclosed internal projections. Unlike In re Apple, where undisclosed technical problems known only to the company seriously undermined the truth of the company's optimistic statements, 886 F.2d at 1115, here the Plaintiffs do not allege the internal projections were based on actual facts known to the Defendants.
 
 
 28
 b. Statement 12
 
 
 29
 Statement 12, issued by Lyondell in the April 25, 1989 Annual Report to Shareholders for Fiscal 1988, contains the following forward-looking prediction regarding the capacity of competitors: "[W]e believe that it will be at least 1991 before significant new grassroots [olefins] capacity can come on stream."
 
 
 30
 Aside from the Amended Complaint's general conclusory allegation of scienter discussed above, the complaint presents no supporting facts that would establish that Lyondell believed this prediction to be false, as required by In re Apple's first condition.
 
 
 31
 The Amended Complaint also puts forth no actual conditions in the industry which might have shown Lyondell had no reasonable basis for the prediction.
 
 
 32
 Although Lyondell had access to an underwriter's report that contradicted the company's forecast, see statement 17, the report is not an undisclosed "fact" as required by the third formulation.
 
 
 33
 In conclusion, Plaintiffs have failed to establish that statements 10 or 12 are "untrue facts" under any of the In re Apple formulations.
 
 CONCLUSION
 
 34
 Even construing all allegations in the light most favorable to the Plaintiffs, they have failed to plead any set of facts in support of their claim which would entitle them to relief. See Love v. United States, 915 F.2d 1242, 1245 (9th Cir.1989). Therefore, the district court's dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is AFFIRMED.[19]
 
 APPENDIX
 
 35
 * CONTESTED STATEMENTS IN PROSPECTUS
 
 
 36
 A. Statements Concerning Lyondell's Principal Product Line
 
 STATEMENT # 1:
 
 37
 Net income was $160 million in the third quarter of 1988, up substantially from the $20 million of net income for the third quarter of 1987. The increase resulted from higher margins for both olefins and refined products and higher olefins volumes in 1988 compared to 1987. In addition, net income in the third quarter of 1988 benefitted from a lower federal income tax rate as a result of the Tax Reform Act of 1986.
 
 
 38
 (ER 3:33-34 p 38(i); Prospectus, ER 7:132; Plaintiffs' Brief 13, 13 n. 11, 30.)
 
 STATEMENT # 2:
 
 39
 Operating income was $259 million in the third quarter of 1988. The increase of $213 million compared to the third quarter of 1987 was primarily the result of increased petrochemical volumes and higher olefins margins, with the remainder coming from higher refined products margins.
 
 
 40
 (ER 3:34 p 38(i); Prospectus, ER 7:133; Plaintiffs' Brief 13 n. 11; 31.)
 
 STATEMENT # 3:
 
 41
 [A] It is anticipated that both olefins plants will be shut down for approximately seven weeks each in the first half of 1989 in order to complete a capacity expansion as well as to perform scheduled maintenance. The Company has increased productivity from its olefins units by extending the periods between scheduled turnarounds from two year cycles to four and five year cycles through the use of enhanced process monitoring equipment and inspection practices. [B] During the period of the shutdown, sales will be made primarily from inventory which was accumulated in 1988 for this purpose. The Company expects that total 1989 olefins sales volumes will approximate expected total 1988 olefins sales volumes. [C] During the fourth quarter of 1988, olefins margins have continued to increase by an average of approximately 10 percent over the third quarter; refined product margins declined from their levels in the early fourth quarter due to higher crude oil costs and the impact of scheduled maintenance at the Houston Refinery. [D] Based upon preliminary unaudited financial data available to the Company at the date hearof, the Company expects that net income for the fourth quarter of 1988 will approximate net income reported for the third quarter of 1988.
 
 
 42
 [3A]: (ER 3:58 p 57, Plaintiffs' Brief 33; [3B]: ER 3:46 p 45(v), Plaintiffs' Brief 33]; [3C]: [ER 3:35 p 38(iv), Plaintiffs' Brief 13, 31]; [3D]: [ER 3:36 p 38(iv), Plaintiffs' Brief 31; Prospectus ER 7:137.)
 
 STATEMENT # 4:
 
 43
 [A] In the early 1970s, following several years of steady growth in product demand, ethylene producers, as well as new entrants to the ethylene industry, embarked on major additions to domestic ethylene capacity. As a consequence, domestic ethylene capacity increased from approximately 23 billion pounds in 1974 to approximately 41 billion pounds in 1981. A confluence of adverse factors then occurred, resulting in a decline in ethylene demand and margins in 1982....
 
 
 44
 Many producers reacted to these circumstances by shutting down older, inefficient units. By 1987, domestic ethylene capacity had declined to approximately 35 billion pounds. However, by 1987, demand began to recover, reaching a level of nearly 34 billion pounds, bringing supply and demand nearly into balance. Continued growth in domestic ethylene demand has resulted during the first nine months of 1988 in higher capacity utilization rates, substantially higher ethylene prices, and significantly higher olefins margins, even compared to 1987 levels. [B] Current domestic industry capacity is not sufficient to meet current domestic product demand. As a result, the Company expects that additional capacity will be added in response to this strong demand. Modifications, expansions and restarts of existing ethylene facilities, including the Company's own expansion plans, have been announced recently, which the Company estimates, in the aggregate, would add 3.2 billion pounds per year of production capacity by the end of 1990. In addition, a number of major chemical companies have announced the construction of new olefins plants, which could bring additional capacity of approximately 4.5 billion pounds on stream by 1992. The Company believes that the majority of these announced plants are designed to provide their owners with incremental feedstock for their own downstream operations. It is possible that additional capacity resulting from new plants may come on stream later; in addition, there could be future modifications and expansions to existing facilities. While the company believes that olefins margins will remain well above the levels of the early 1980s for at least the next two years, it is not possible to predict the ultimate impact of increased capacity or any of the other factors discussed above on margins in the future.
 
 
 45
 (ER 3:37-39; Prospectus, ER 7:146-47; Plaintiffs' Brief 14, 15, 31, 32.)
 
 B. Statements Concerning Demand and Volumes
 STATEMENT # 5:
 
 46
 Sales and other operating revenues were $1,184 million in the third quarter of 1988, an increase of $191 million from the third quarter of 1987. This increase was the result of higher petrochemical prices and volumes and higher crude oil exchange and resale volumes, particularly offset by lower refined product prices. Petrochemical sales prices increased primarily as a result of very strong demand for ethylene....
 
 
 47
 The Company's ethylene prices in the third quarter of 1988 were more than double the prices in the third quarter of 1987 due to the supply/demand condition. These prices increases were the result of increasing demand for ethylene during the first nine months of 1988 when ethylene plants were already operating close to capacity. Damage to the plant of a competitor in the second quarter of 1988 further exacerbated the supply situation.
 
 
 48
 (ER 3:44 p 45(i); Prospectus, ER 7:132-33; Plaintiffs' Brief 32.)
 
 STATEMENT # 6:
 
 49
 The Company has decided to expand the capacity of its existing olefins plants and to install an ethylene/propylene recovery unit at the Houston Refinery in response to the current market demand for ethylene and the Company's view of future market conditions.
 
 
 50
 (ER 3:47 p 45(vi); Prospectus, ER 7:130; Plaintiffs' Brief 32.)
 
 
 51
 C. Statements Concerning Reasons for the Transactions
 
 STATEMENT # 7:
 
 52
 Lyondell's status as a merchant marketer provides the Company flexibility to adjust its product output mix in response to changing market conditions to take advantage of the highest margins available. This status gives the Company an advantage over other refiners and petrochemical manufacturers that must make a certain amount of a product to supply their own downstream operations.
 
 
 53
 (ER 3:55; Prospectus, ER 7:143; Plaintiffs' Brief 17.)
 
 II
 CONTESTED POST-OFFERING STATEMENTS
 
 54
 A. Statements Made During "Road Show"
 
 STATEMENT # 8:
 
 55
 For the olefins business, we expect strong margins to continue for the next few years. We see strength in the ethylene market ... We are very optimistic about the outlook for olefins. We just don't believe that the difficult environment experienced by the industry during the early 1980's will be repeated. The fundamentals are too strong.
 
 
 56
 (ER 3:67 (statement attributed to Defendant Bob G. Gower, President, CEO and Director of the Company) (ellipses in original); Plaintiffs' Brief 9, 12.)
 
 STATEMENT # 9:
 
 57
 Looking into 1989, we're not going to make any predictions, but I will share with you our views on the fundamentals of the industry as we see them.... We believe that the strong olefins market will continue and that average ethylene margins throughout 1989 will be above the 1988 average.
 
 
 58
 (ER 3:67-68 (statement attributed to Defendant Dan F. Smith, Executive Vice President of Lyondell) (ellipses in original); Plaintiffs' Brief 12.)
 
 B. Statements Reported by News Sources
 STATEMENT # 10:
 
 59
 Lyondell's first quarter results reflect a continuing, strong market for petrochemical products.... In late April, we will begin the previously announced expansion of our two olefins plant.... This will increase our ethylene capacity by approximately 20 percent, lower our production costs and improve the yields of related by-products when the project is completed. In spite of the turnarounds and expansion work, we expect our sales volumes in 1989 to be essentially the same as in 1988.
 
 
 60
 (ER 3:72 (statement attributed to Defendant Gower as reported on the Business Wire) (ellipses in original); Plaintiffs' Brief 20.)
 
 
 61
 C. Statements in Company Reports to Shareholders
 
 STATEMENT # 11:
 
 62
 Virtually all of Lyondell's product lines had improved performances in 1988. A tight supply/demand environment for our major petrochemical products resulted in significant margin improvements for olefins and methanol.
 
 
 63
 (ER 3:73 (statement in the company's Annual Report to Shareholders for Fiscal 1988; Plaintiffs' Brief 20.)
 
 STATEMENT # 12:
 
 64
 As we move into 1989, we are optimistic about the outlook for olefins. The fundamentals of this business are very strong. Capacity has contracted in recent years while demand has continued to grow and we believe that it will be at least 1991 before significant new grassroots capacity can come on stream.
 
 
 65
 (ER 3:73 (statement in the company's Annual Report to Shareholders for Fiscal 1988); Plaintiffs' Brief 20.)
 
 STATEMENT # 13:
 
 66
 To take advantage of the positive outlook for olefins, Lyondell will complete a major expansion of its two olefins plants during 1989. This will increase ethylene capacity by approximately 20 percent to more than 3.4 billion pounds and will also increase the production capacity for propylene and olefins by-products.
 
 
 67
 Inventories have been set aside to supply customer demand during the expansion so that sales volumes in 1989 are expected to be about equal with 1988. Lyondell will realize the first full-year benefit of the expansion in 1990.
 
 
 68
 (ER 3:73-74 (statement in the company's Annual Report to Shareholders for Fiscal 1988); Plaintiffs' Brief 20.)
 
 STATEMENT # 14:
 
 69
 Looking longer term, many industry observers are predicting that the petrochemical industry is headed back to severe overcapacity similar to 1982. Certainly, the stock market must believe this or it would not be discounting the stock values of petrochemical companies so much.
 
 
 70
 Although there are many factors that are beyond our control, we continue to be more optimistic for the olefins business. We certainly do not expect a return to the conditions of 1982.
 
 
 71
 Demand, on the other hand, has been growing faster than the GNP growth rate during the last three years. If the key economic factors stay in the general areas of where they are now, we believe demand growth for olefins will remain in line with the GNP growth rate and possibly higher.
 
 
 72
 In conclusion, we are optimistic about the outlook for olefins and for refining. The fundamentals of these businesses are very strong.
 
 
 73
 At Lyondell, we plan to continue our emphasis on low cost, high quality, disciplined capital spending and positive management. With this approach, we believe Lyondell will remain very profitable and financially strong going forward.
 
 
 74
 (ER 3:76-77 (statement of Defendant Gower reported in the company's Quarterly Report to Shareholders for the 3 month ending March 31, 1989); Plaintiffs' Brief 21.)
 
 III
 STATEMENTS IN INTERNAL PROJECTIONS
 A. Internal Projections by the Company
 STATEMENT # 15:
 ETHYLENE MARGINS
 Base Case
 
 75
 (Nominal Cents Per Pound)
 
 
 76
 Actual Forecast
03 04 1989 1990 1991 1992 1993
29.50 32.0 29.0 19.0 17.0 13.0 13.0
 Downside Case
29.50 32.0 25.0 19.0 17.0 10.0 10.0
 
 
 77
 (ER 3:40-41; Plaintiffs' Brief 18 n. 13.)
 
 B. Forecast by Underwriters
 
 78
 STATEMENT # 16:
 1988 1989 1990 1991 1992
 ($ millions)
Olefins sales $697 $675 $614 $549 $376
Net Income $530 $450 $394 $363 $265
Olefins Cash Margin .25 .24 .19 .17 .13
 Case B
 1988 1989 1990 1991 1992
 ($ millions)
Olefins Revenues $697 $675 $614 $549 $376
Net Income $520 $461 $398 $361 $259
Gross Profit $872 $813 $702 $633 $459
 Case C
Olefins Revenues $697 $675 $614 $549 $376
Net Income $520 $468 $405 $368 $267
Gross Profit $872 $813 $702 $633 $459
 
 
 79
 (ER 3:65-66; Plaintiffs' Brief 18, 19, 19 n. 14.)
 
 STATEMENT # 17:
 
 80
 Other than [the] 1989 ethylene debottleneck[ing], there are no identifiable opportunities for growth.... [The p]arent is selling at [the] peak earnings point and taking out a lot of cash leaving [Lyondell] with significant debt burden.
 
 
 81
 (ER 3:66-67 (attributed to valuation analysis of Lyondell by Underwriters); Plaintiffs' Brief 19; see generally Internal Report, Supplemental Excerpts of Record 440-474.)
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Section 11 (15 U.S.C. § 77k) is limited to statements made in a prospectus
 
 
 [2]
 Statements 1, 2, 3C, 11
 
 
 [3]
 Statement 3A
 
 
 [4]
 Statement 4A
 
 
 [5]
 Statement 5
 
 
 [6]
 Statements 3B, 3D, and 4B
 
 
 [7]
 Statements 8-10, 12-14
 
 
 [8]
 The nine forward-looking predictions are statements 3B, 3D and 4B (made in the prospectus); and 8-9, 12-14 (made in post-offering literature and oral presentations)
 
 
 [9]
 Statement 3B provides, "The Company expects that total 1989 olefins sales volumes will approximate expected total 1988 olefins sales volumes."
 
 
 [10]
 Statement 4B provides, in part, "[T]he Company expects that additional capacity will be added in response to this strong demand."
 
 
 [11]
 Statement 13 provides, in part: "Lyondell will realize the first full-year benefit of the expansion [of its two olefins plants] in 1990."
 
 
 [12]
 Statement 13 provides, in part, "[Expansion of our plants] will increase ethylene capacity by approximately 20 percent to more than 3.4 billion pounds and will also increase the production capacity for proplyene and olefins by-products."
 
 
 [13]
 Statement 14 provides, "[W]e continue to be more optimistic for the olefins business."
 
 
 [14]
 Reference to net income in the Amended Complaint is as follows: "On January 23, 1989, several days prior to the close of the Offering--January 26th, Lyondell reported record net income of $543 million for its fiscal 1988 year. For the fourth quarter of 1988, record net income of $156 million was also reported, compared with $55 million in the fourth quarter of 1987." (ER 3:71 p 83.) "For its second fiscal quarter ended June 30, 1989, Lyondell again reported lower net income of $103 million (on increased sales of $1.28 billion)." (ER 3:78 p 87.) "For its third quarter of 1989, Lyondell reporting net income of $73 million on sales of $1.3 billion, compared with net income of $160 million on sales of $1.2 billion in the third quarter of 1988." (ER 3:80 p 88.)
 
 
 [15]
 Reference to lower sales volumes in the Amended Complaint is contained in a summary of the Lyondell's 10-Q report for the third quarter of 1989, as follows: "[D]efendants disclosed in the [10-Q] report that Lyondell's deteriorating performance resulted from, inter alia, reduced olefins margins, lower petrochemical production and sales volumes...." (ER 3:81 p 88.)
 The 10-Q report which followed, and which the above quoted portion of the Amended Complaint purportedly summarized, did not mention lowered sales volumes. (ER 3:81-82 p 88.)
 
 
 [16]
 Statement 10 states, "In spite of the turnarounds and expansion work, we expect our sales volumes in 1989 to be essentially the same as in 1988."
 The Amended Complaint sufficiently alleges the statement to be false as follows: "... 1989 sales volumes were 'lower' than in 1988 as stated in Lyondell's 1989 Annual Report to Shareholders." (ER 3:48 p 46(i).)
 
 
 [17]
 Statement 12 states, "[W]e believe it will be at least 1991 before significant new grassroots [olefins] capacity can come on stream."
 The Amended Complaint alleges the prediction to be false citing the 1990 Annual Report to Shareholders for Fiscal 1989 in which Lyondell revealed that the industry capacity for olefins "increased due to the completion of debottlenecking projects in 1989." (ER 3:84 p 89.)
 
 
 [18]
 Statements 6 and 7, which consist of present facts regarding Lyondell's decision to expand capacity and its status as a merchant marketer were also never alleged to be false
 
 
 [19]
 We also deny Plaintiffs' unsupported request to reverse the dismissal of their state law claims